## Case No. 12,070.

ROSS v. The ACTIVE.

[See Case No. 12,071.]

---

## Case No. 12,071.

ROSS v. The ACTIVE.

[2 Wash. C. C. 226.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1808.

SHIPPING — MASTER — POWER TO BIND SHIP — To SELL CARGO—GENERAL AVERAGE—ORDINARY DECAY.

1. Regularly, the master is the agent of the ship owner only, and has nothing to do with the cargo, but for its safe keeping and transportation. The supra-cargo represents the owner of the cargo, and has nothing to do with the ship.

2. The master has full powers to bind the ship owner for the money he may borrow for the necessary purposes in a foreign country, where the owner is not present, and where the loan is exclusively for the interest of the owner, and if it cannot be obtained upon bills drawn on the owner, which he is bound to pay, he may pledge the ship, to repay the loan with maritime interest.

[Cited in Burke v. The M. P. Rich, Case No. 2,161.]

3. If the owner of the ship is also owner of the cargo, the master may sell part of the cargo, to raise money for necessary wants of the ship, and, if in no other manner the money can be obtained, and the loan is absolutely required for the success of the voyage, he may sell a part of the cargo of the ship, to whomsoever it may belong.

[Cited in Bank of St. Thomas v. The Julia Blake, 107 U. S. 427, 2 Sup. Ct. 699.]

4. If the owner of the cargo is on board of a vessel, at the time of a disaster requiring that money shall be obtained by the master to enable the vessel to prosecute the voyage, he is not bound to advance funds, and if he does so, he is entitled to satisfactory security, and an extra and adequate compensation for the advance.

5. Such contracts will, however, be at all times carefully scrutinized, as the master may be more exposed to imposition in making them, than in a loan from a stranger.

6. Where, in the course of a voyage, a ship from ordinary decay requires to be repaired at an immediate port, the expenses of such repairs are not the subject of general average.

7. General average is incurred where the expenses or losses arose in a case of emergency, not produced by the misconduct or unskilfulness of the master, and not resulting from the ordinary circumstances of the voyage.

[Cited in The Ontario, 37 Fed. 222.]

[Cited in Hause v. New Orleans M. & F. Ins. Co., 10 La. 1.]

[Appeal from the district court of the United States for the district of Pennsylvania.]

---

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

This was an appeal upon a decree entered, pro forma, in the district court, upon the following proceedings, filed in that court:

To the Honourable Richard Peters, Judge of the District Court of the United States, for the Pennsylvania District.

The libel of Charles Ross, of Philadelphia, merchant, respectfully showeth: That the ship Active, commanded by Captain Elihu E. Morris, belonging to William Davy and John B. Davy, merchants, of Philadelphia, did, on her last voyage from Canton, put into the Isle of France, a foreign port, in which none of her owners resided, for the purpose of procuring a fresh supply of water and provisions. That after her arrival there, it was found that the said ship was in want of very considerable repairs, to enable her to continue her intended voyage, for which purpose the said captain was under the necessity of raising a large sum of money, and having tried, without success, various methods to procure the necessary funds to discharge the said expenses, he decided on drawing bills on his owners; and being unable to negotiate the same without an endorser, he applied to your libellant for that purpose, and proposed to your libellant, as a guarantee for the said endorsements, to mortgage and hypothecate the said ship Active, her tackle, apparel, and freight; which proposal your libellant, at the earnest request of the said Captain Morris, did accede to. And in pursuance thereof, the said Elihu E. Morris did, thereupon, draw two bills of exchange in favour of your libellant, both of them directed to William & John B. Davy, merchants, Philadelphia, (being the owners of the said ship Active,) both dated the 10th day of November, 1807, and payable at sixty days sight, one whereof is for the sum of 16.281 dollars, and the other for the sum of 4,884 dollars and 30 cents, which two bills your libellant then and there endorsed; and to secure the payment thereof, the said Elihu E. Morris, then and there, by an instrument of writing under his hand and seal, did hypothecate, impawn, and mortgage, to your libellant, the said ship Active, her tackle, rigging, utensils, and freight, which instrument, sealed with the seal of the said Elihu E. Morris, and dated November the 11th, 1807, your libellant now produces to this honourable court. And your libellant further avers, that the said ship Active, after having been so repaired and refitted, by means of the advances procured by virtue of the said bills of exchange, proceeded on her voyage, and hath safely arrived at the port of Philadelphia; and the said two bills have been presented to the said William Davy & John B. Davy, who have refused to pay the same. Your libellant further shows that the said bills are now become his property, he having taken up the first from Captain Thomas Skelly, who had the same; and the other being originally his property, and still continuing so. Wherefore your libellant prays, that due proof being made of the premises, the said ship, the Active, her tackle, rigging, and utensils, may, by the sentence and decree of this honourable court, be adjudged to bé sold, and that due process may issue accordingly, and that the proceeds thereof, so much as may be necessary, be paid to your libellant, in satisfaction of his said demands.

To the Honourable Richard Peters, Esquire, Judge of the District Court of Pennsylvania.

The joint answer of William Davy & John B. Davy, to the libel of Charles Ross, respectfully showeth:   That the respondents, being owners of the ship Active, Elihu E. Morris, master, let her upon freight to the libellant and Joseph Taggart, James Latimer, and Gray & Taylor, for a voyage from the port of Philadelphia to Canton, and back again; upon the consideration, terms, and conditions, specified in the charter party, bearing date the 28th day of July, 1806, whereof a true copy is hereunto annexed. That the said libellant was constituted the supra-cargo, as well for all the said charterers, as for sundry merchants, who shipped goods on board of the Active, under them, for the voyage aforesaid; by which the respondents were induced, also, to repose special trust and confidence in him, touching all the concerns of the ship, in the commencement, prosecution, and termination of the voyage: and particularly they directed the said Elihu E. Morris to accept the libellant's advice, on such points as their interests should be implicated in, and could be benefited by.   That the respondents, well knowing the nature and duration of such a voyage, ordered the necessary workmen, and the said master, to prepare the said ship at the port of Philadelphia, for the performance thereof, in the best manner; and the said ship was so fitted and prepared.   And as certain supplies would inevitably be required for the return voyage, the respondents stipulated in the said charter party, that the libellant, as the agent for all the charterers, should pay a certain portion of the freight at Canton, for the purpose of defraying all the necessary expenses and supplies, port charges, and factory expenditures, for the subsequent prosecution of the voyage. That at time of entering into the said charter party, the respondents presumed the outward adventure would consist of money, as is usual in such voyages; and in fact, the charterers, collectively, gave no notice of any other cargo, and the libellant, individually, for his own account, only mentioned the addition of a few bales of camblets, some ginseng, and a small quantity of liquors; so that the respondents were induced to put in a full quantity of ballast: but on the eve of the ship's departure, cargo enough almost to fill the vessel was sent on board, the ship was detained, an unexpected expense incurred, and the voyage, from the quantity of lading, greatly retarded.   That the said ship sailed from Philadelphia, on the said voyage, on the 13th day

of August, in the year 1806, tight, staunch, and strong, and well and sufficiently fitted, furnished, manned, and provided; and arrived in safety at Wampoa, on the 17th day of February, in the year 1807, where she delivered her outward cargo in good order. That after the outward cargo was delivered as aforesaid, it became necessary to caulk the ship, overhaul her rigging, and to recruit her provisions and supplies, as is usual in all similar voyages; and the libellant being possessed as aforesaid, of adequate funds for that purpose, belonging to the respondents, undertook to furnish the requisite provisions and supplies, for the completion of the ship's voyage. That the libellant, as well while he was at Canton, as since his return to Philadelphia, has represented, that he did furnish the provisions and supplies for the completion of her voyage to Philadelphia, and has actually exhibited an account of disbursements, and commissions for so doing, to the amount of about 7,090 dollars. That the libellant, pursuing the interests of the cargo in preference to the interest and convenience of the ship, prevailed on the said Elihu E. Morris to take on board a return cargo so disproportioned to the tonnage of the ship, that there was not left room sufficient for the stowage of her cables and other tackle below the decks, nor for depositing a competent supply of water and provisions, in the usual places on board the vessel. But, nevertheless, she sailed from Canton, bound to Philadelphia, on the 10th of May, in the year 1807, tight, staunch, and strong, and fitted, furnished, manned, and provided for the voyage. That the voyage having been protracted, as well by the conduct of the libellant, as by storms, calms, and adverse winds; the monsoon had changed before the ship departed from Canton, and the captain deemed it expedient to pursue the eastern passage for the Straits of Bally, on the way to Philadelphia. But, having taken in water and fresh provisions at Bally, and having passed the Straits of Bally, a slight appearance of leaking, and an apprehension of a want of water and salt provisions, (notwithstanding the recent supply, and the opportunity to procure more at Bally,) were made pretences for going to the Isle of France, by the libellant, and the said Elihu E. Morris, acting under the libellant's persuasion and control. No sooner was the ship supplied with water and provisions, and ready again to depart from the Isle of France, than the leak aforesaid was urged by the libellant, for a general survey of the ship, for landing the cargo, and for incurring all the enormous expenses, which constitute the unjust and unnecessary foundation of the hypothecation mentioned in the libel. That, notwithstanding the length and the vicissitudes of the voyage, and the clamour excited by the libellant, touching the condition of the said ship, the cargo was landed in good order at the Isle of France; insomuch that the libellant did himself declare, that "the cargo

was delivered there in as good order as it was received; nor was there ever a China cargo delivered so free of breakage, and so free of damage of every kind, with the exception of twelve or fifteen bales of nankeens, which were between decks." The repairs, actually necessary, were also found to be trifling; and, in truth, the ship departed from the Isle of France, after the expense had been incurred, less valuable than before. That, in order to discharge the debts thus unnecessarily incurred, the said Captain Elihu E. Morris proposed to sell a part of the cargo, which might have been there effected without a sacrifice; but the libellant resisted the sale, and declared that he would formally protest against any attempt to make it: whereupon the said Captain Morris was induced to withdraw the advertisements he had made for that purpose, and to abandon the sale altogether. That the libellant, with a view, as it would seem, to his own benefit and emolument, did, himself, negotiate and obtain, in the name of the said Elihu E. Morris, a loan of a sum of money of at least double the amount actually expended, from a certain Captain William Waters, then being at the Isle of France, for a premium (as it has been alleged) of ten per cent.; and did thereupon represent to the said Captain Elihu E. Morris, that bills of exchange must be drawn on the respondents for the amount of the loan and premium, which he, the libellant, was required by the said Captain Waters to endorse. That the libellant, having effected the said loan as aforesaid, demanded from the said Elihu E. Morris, a premium of thirty per cent. for endorsing the said bills; and also an hypothecation of the ship, cargo, freight, and insurance; against which demand the said Elihu E. Morris remonstrated; but at length, under the persuasion and control of the libellant, complied. By these operations, it will appear, that the sum actually expended for repairs and supplies, amounted to only 13,304 dollars and 42 cents, including a commission of five per cent.: that, in order to provide for the payment of that debt, a sum exceeding 28,000 dollars was obtained by the libellant, as aforesaid, from Captain Waters; but for the difference between the two sums, no account has been rendered, nor any allowance made to the respondents; that a premium of ten per cent. has been charged in favour of Captain Waters, on the gross sum obtained from him; for the amount of which, added to the sum actually expended, making 16,281 dollars, one of the bills of exchange in the said libel mentioned was drawn; and that a premium of thirty per cent. has been charged on the said sum of 16,281 dollars, in favour of the libellant, on account merely of his endorsement, making the sum of 4,884 dollars and 30 cents, for which the other bill of exchange in the libel mentioned was drawn. That the ship sailed from the Isle of France, on the 12th day of November, in the year 1807, upon her return

voyage, still carrying her cables, during a great part of the voyage, upon deck, for the accommodation of the cargo, and arrived at the port of Philadelphia, on the 4th of March, 1808; when the said libellant, under colour of the said hypothecation, and also pretending that the expenses aforesaid, at the Isle of France, did not constitute a claim of general average, forbade the charterers to settle and pay the freight-money, according to the terms of the charter party; in consequence whereof, the cargo remained on board of the said ship, at a great expense and hazard, until the 31st of the same month, March; upon which day, and on subsequent days, the whole of the cargo (consisting of nearly eight thousand packages) was landed in perfect order at the port of Philadelphia, and the voyage concluded, without loss or injury to the outward and homeward cargoes, by default of the ship, or of the respondents, at any part of the voyage.

And the respondents, further answering, say, that true it is, as the libel alleges, that the said Captain Elihu E. Morris did draw upon them the two bills of exchange in the said libel mentioned, which they have refused to accept, and do not mean to pay, because they do not think themselves bound in law or justice to do so; the said bills having been unnecessarily and improperly drawn, without their authority, knowledge, or approbation. And the respondents further admit, that the said Captain Elihu E. Morris did execute an instrument in writing of the date specified in said libel, purporting to be a mortgage or hypothecation to the libellant, of the ship Active, her tackle, rigging, utensils, and freight, the cargo of the said ship, and the insurance on the said ship, freight, and cargo; which these respondents believe to be the same instrument in the said libel referred to.

But the respondents, further answering, aver, and offer to prove: (1) That the expenses incurred for the repairs and equipments of the said ship Active, at the Isle of France, were incurred at the instance, and by the procurement, and owing to the negligence and wrong of the libellant, without necessity, or just and sufficient cause to charge the respondents therewith, by hypothecation or otherwise. (2) That, as well the libellant as the said Captain Elihu E. Morris, was in possession of funds belonging to the owners of the ship, freight, cargo, and insurance, adequate to defray all the necessary expenses of the ship, her repairs and supplies, upon the voyage, without resorting to any loan or loans of money. (3) That if it had been necessary to raise money by loan, for defraying the expenses of the ship, her repairs and supplies, during the said voyage, the same might have been obtained upon a moderate premium, upon the security of the ship and freight. (4) That the libellant did not lend or advance the whole or any part of the money, for which the alleged hypothecation was given. (5) That the said libellant, being one of the charterers, being supra-cargo for most of the shippers, and being a part owner of the cargo, on the spot at the time when the expenses were incurred, could not rightfully demand or receive the said premium and alleged hypothecation; nor could the said Captain Elihu E. Morris rightfully grant the same to the libellant. (6) That any expenses necessarily incurred for repairs and supplies, or on account of damage and detention of the ship at the Isle of France, constitute a claim for general average; and the proportion thereof due from the libellant ought to be allowed and paid to the respondents.

And the respondents respectfully pray, that the honorable court, in consideration of the premises, will dismiss the said libel, with costs.

Replication of Charles Ross, Libellant, to the Answer of William and John B. Davy, Respondents.

This libellant, saving and reserving all and all manner of benefit of exceptions to the manifest errors, uncertainties, and imperfections, in the said answer contained, for reply thereto, or to so much thereof as it is material for him to reply to, replieth: That by any thing in the said answer contained, he ought not to be precluded from having and maintaining his libel aforesaid, according to the prayer thereof, because, he saith; that all and singular the matters and things in his said libel contained and set forth, are just and true. Without that, that the said ship Active's putting into the Isle of France, on her said return voyage, was occasioned, or the expenses for her repairs or equipments there, were incurred, by or at this libellant's instance, procurement, negligence, or wrong; or that this libellant, or the said Captain Morris, were in possession of funds applicable or adequate to defray the necessary repairs, expenses, and supplies of the said ship, at the Isle of France, without adopting the measures in this libellant's libel set forth; or that the loan in the said libel set forth could have been obtained at a less premium; or that this libellant could not, as in his libel he hath set forth, lawfully receive the said hypothecation; or that such repairs constitute a general average, in preclusion of this libellant's right of recovering on the said hypothecation; or that any other matter or thing in the said answer contained is true, or sufficient to bar his said demand. Wherefore he prays, as in his libel he before hath prayed.

It is agreed, that it be submitted to the court to decide, whether the libellant, by endorsing the bills mentioned in the hypothecation, did an act which, under all the circumstances, he was not bound to do without a compensation, and thereby rendered any service to the respondents? If the court shall be of opinion in the affirmative, it is

agreed that the question of compensation shall be settled by them—the court to say, whether the libellant be entitled to the whole, or what part.

W. Rawle, for libellant.
A. J. Dallas, for respondents.

WASHINGTON, Circuit Justice. The agreement of the parties has left but two questions for the court to decide. First; whether the libellant was or was not bound, under all the circumstances of this case, to endorse the bills of Captain Morris, for securing which, the hypothecation was given, without compensation, and thereby render a service to the respondent; and if not so obliged, the amount of compensation to which he is entitled. Second; whether the expenses incurred by the vessel at the Isle of France, must be borne by the vessel, or are to be considered as a subject of general average. This agreement will render it unnecessary for the court to consider the objections made to the form of the hypothecation, and the right of the libellant to recover maritime interest, in virtue of that instrument. Regularly, the master is the agent of the ship owner only, and has nothing to do with the cargo, but in relation to its safe custody and transportation. The supra-cargo, on the other hand, if there be one on board, represents exclusively the owner of the cargo, acts under his authority, and is a stranger, as to what concerns the ship or its owner. The powers of the master, in relation to his employer, are always considerable; and in no instance more important, than in that of binding his owners, and their property, by his contracts for money borrowed in foreign parts, for the necessary purposes of the voyage. To prevent, as much as possible, the injuries which may result to the owners, by the improvident exercise of this power, the ordinances of foreign countries, and the rules of our own courts, have imposed every restraint upon the master, which the reason and nature of the case demand. The contract must not only be fair in itself, but it must be made in a foreign country, where there is no owner, and under such circumstances of necessity, as show that it was entered into with a view to the interest of the owner. The master is bound to raise the money by means the least injurious to those he represents. If his owners are known, and have credit in the place where the money is wanted, he should, in the first place, endeavour to raise it by drawing bills upon them, which they are bound to accept and pay. If the money cannot be obtained in this way, his next recourse is to the property of his owner, which he may pledge for the security of the lender; and, by way of inducement to the person disposed to assist him, he may bind the property, upon its safe arrival, to compensate the loan by the payment of an extraordinary premium, be-

yond the legal rate of interest. If the owner of the ship be also owner or part owner of the cargo, the master may, in his discretion, sell a part of the cargo, in preference to borrowing at an exorbitant rate of premium; and, in his choice of means, his judgment, fairly exercised, must govern him. If, in none of these ways he can supply his wants, he may then go beyond the general scope of his authority as master, and may sell a part of the cargo, or hypothecate the whole. This extraordinary power, in relation to those whose interest he does not represent, is cast or forced upon him, in the language of Sir William Scott, by the extreme necessity of his situation. It may, we think, be derived from a tacit agreement of the owner of the cargo, to prevent the voyage, in which he is equally interested with the owner of the ship, from being broken up, or unreasonably delayed. But, at all events, the necessity must be such as to connect the act with the success of the voyage; and not for the exclusive interest of the ship owner. Thus far, with respect to the powers of the master.

It is said, that by an article of the Consolato del Mare, the merchant, if he be present, and has money, is obliged to advance it for the necessities of the voyage; and hence it is inferred, that if he has credit instead of money, he is bound to use the former for procuring the latter. We do not know that this provision is to be met with in the Laws of Oleron, or in any other foreign ordinance; and it is to be observed, that the above article is silent as to the terms and conditions upon which the advance is to be made. There can be very little doubt, upon the reason of the case, as to the occasion when this obligation upon the merchant arises. If the master is unable to raise the money by any of the means before mentioned, and without it is unable to prosecute the voyage the obligation of the merchant to advance becomes imperious. But this duty results from a circumstance which is intimately connected with his own interest, as well as with the interest of the ship owner. Even then he may refuse to lend, and leave the master to his extraordinary power of selling a part of the cargo; because it may be his interest that this latter course should be pursued. But, if the question merely be, which mode is most for the interest of the ship owner, we must hesitate in yielding our assent to the proposition, that the merchant is under any obligation to act in the way which is best calculated to promote exclusively the interest of the ship owner. Suppose, for example, it should be in the power of the master to borrow money upon the security of the vessel, but at a high premium; and that by selling part of the cargo, a loss would result to the ship owner, equal to such extraordinary premium; will it be contended, that in such cases, the merchant, or his representative on board, would be obliged to advance his money or credit, to relieve the owner of

the ship from this loss? What reason or justice is there in imposing such a duty upon him? He is under no other obligations to the ship owner, than such as the contract between them imposes. The one engages to carry the goods of the other safely to their destined port, for which he is to receive a stipulated compensation. There are no intermediate duties created, but such as are occasioned by a common danger and a common interest, resulting from the perils of the voyage.

But if the voyage may be prosecuted, the owner of the vessel cannot excuse himself for not doing so, because the merchant refuses him facilities within his power, and which he is at perfect liberty to grant or to withhold. Should a merchant be found so perversely blind to his own interest, and so churlishly disposed in relation to the carrier of his property, as to hazard the success of the voyage, by refusing his aid in a case of such extreme necessity, we will not say how this conduct might affect any claim which he might have against the carrier, upon the contract of affreightment; neither will we say how it might affect his claim against the ship owner, for the value of the goods which the master had been obliged to sacrifice for the want of the money or credit, which it was in the power of the merchant to lend. These are extreme cases, which are not now to be considered. But it is decidedly the opinion of the court, that the merchant is under no obligation to advance his money or credit, with a view merely to benefit the ship owner; and in no instance is he bound so to do, but upon condition of receiving a reasonable compensation. If he may demand a compensation for the loan, he may, a fortiori, demand satisfactory security for repayment of his advances. But, whilst we admit the validity of these marine contracts, between the master and the merchant, or his representative, they will always be looked at with a greater degree of suspicion, than where the lender is a stranger to the parties. The merchant is better informed than a stranger, as to the personal responsibility of the ship owner, and the risk which he runs; the influence which he may possibly have over the other contracting party, will in general warrant the apprehension, that better terms have been obtained from the master than were strictly fair. In the particular case before us, every thing appears to be fair, and there is no cause to impeach the correctness of the libellant's conduct in relation to this negotiation. But, in general, the court would feel itself called upon to hold a strict hand over contracts of this description, entered into with the owner of a cargo in a foreign country; and to scrutinize, with great exactness, the circumstances which led to the contract, and which ought to affect the stipulated compensation.

This leads to the consideration of the premium claimed by the libellant, for his endorsements of Captain Morris's bills, and the compensation to which he is justly and equitably

entitled. It is in full proof, that every effort was made by Captain Morris to obtain the money he wanted, previous to the contract entered into with the libellant. The respondents, being probably less known at this part of the Isle of France than they are in other parts of the world, and the difficulty of effecting an insurance on the risk which the lender was to run, rendered it impracticable to borrow money on almost any terms. Part of the cargo might have been sold, but upon the most ruinous terms for the owners of the ship. The plan ultimately adopted, was considered to be most to the advantage of the respondents, and in this opinion we concur. But it does not follow, from the admission of these facts, that the claim of the libellant to a compensation, equal or nearly equal to the sum which the respondents must have paid, by the adoption of other means of raising the money in the power of the master, is founded in equitable principles. The high premium claimed by persons residing in the island, arose from the scarcity of money, their ignorance of the solidity of the owners, and the hazards which attended any security which could be given. Whereas, the libellant was acquainted with the owners, resided in the same city with them, and besides, would, upon the safe arrival of the vessel, have in his hands a much larger amount than that for which he was to become responsible. Captain Waters lent this very money, at a premium of ten per cent. upon the security of the libellant, and perhaps upon the additional security of the hypothecation. Did not the libellant lend his credit upon a security equally sufficient? As to Captain Waters, however, it is to be considered that he was under the pressure of a certain necessity to get this money to the United States; and, in addition to his ten per cent., he received, by means of this negotiation, a compensation in the saving of the freight of his specie, if indeed, on any terms, he could have got it away. Mr. Adgate proves, that he had received fourteen per cent. for approved bills with good endorsers. Mr. Ashmead mentioned, that he had received for money from twenty to fifty-five per cent., secured by bills on Philadelphia. Upon the whole, we are of opinion, that, under all the circumstances of this case, a premium of fifteen per cent. will be a liberal compensation to the libellant for his endorsement, exclusive of that which the master was compelled to pay to Captain Waters for the loan.

The next question is, are the expenses incurred at the Isle of France, to be considered as a subject of general or partial average? The great and leading rule, respecting this subject, is, that all persons benefited by an act of the master, with a view to the general safety of all, in case of extraordinary necessity or peril, must contribute to the loss, in proportion to the property saved by the act. The act must not only be performed with this view, but it must be in a case of emergency, not produced by the misconduct or unskilful-

ness of the master, or commander, and not resulting from the ordinary circumstances of the voyage: as, if goods be thrown overboard in a storm, in order to lighten the vessel, and insure her safety; if injuries be done to the vessel for a similar purpose, or expenses be incurred in repairing a damage done to the vessel, by the violence of the winds, to avoid the pursuit of enemies, or pirates, and in many other cases of the like nature. But if the damages to the ship arise from the ordinary occurrences of the voyage, and not from some extraordinary violence or peril, to which she has been exposed, the loss must be borne by the owner of the vessel, who engages, by his contract with the freighter, that she shall be stout, staunch, and strong, and properly equipped for the voyage, and whether it be expressly stipulated or not, he is bound to keep the vessel in this condition, during the voyage, unless prevented by some extraordinary peril, for which he can, in no respect, be responsible.

In this case, the Active left Philadelphia on her outward voyage, well equipped, and, in our opinion, perfectly seaworthy. We think, also, that she was seaworthy at the time she left Wampoa on her return. Though a sound vessel at the time of her sailing from Philadelphia, she was, nevertheless, old, and upon so long a voyage as this generally is, rendered unusually so in this case by adverse winds, and the advanced season when she left Wampoa, the injury sustained in her bends and the loss of her copper, appear to have resulted from a gradual and an ordinary decay, and not from any violent winds to which she was exposed on her outward or homeward voyage. That the owners have been subjected to a very heavy, and perhaps unnecessary expense, by the proceedings of the tribunal at the Isle of France, seems highly probable, and is much to be lamented. But surely this is not imputable to the libellant, who would have transgressed the limits of his duty by interfering, and who might have exposed himself to censure, if not to responsibility, had he interfered, and an accident had befallen the ship. Upon this point, therefore, we are of opinion, that the expenses incurred by the ship at the Isle of France, are not properly a subject of general average.