Chief Justice Marshall
delivered the opinion of the Court.
This action, by ordinary petition, was brought on the 9th of March, 1853, by E. Bustard against Bentley and others, as owners of the steamboat Glendy Burke, of which J. Bentley was captain or master, to recover damages for the non-delivery of a large quantity of molasses, in barrels and half barrels, part of that which had been received by the boat at or near New Orleans, to be transported to and delivered at Louisville or Portland, the dangers of the river and fire only excepted. The bill of lading containing the number and marks of the barrels, and the contract for transportation, is referred to and filed with the petition, and is in the usual form, except that it has at the end, and above the signature, the following clause: “Not responsible for leakage or *671 cooperage.” The petition, however, alledges that the barrels, &c., delivered, were notin as good condition-as when received, by reason of which the plaintiff had been compelled to expend a named sum for hoops, &c., including which he claims as the balance due him, after deducting freight, the sum of $4,129, afterwards stated in an amendment to be $4,114 '83, for which he claims judgment, &c.
The defendants demurred tó the petition, and on the demurrer being overruled, moved that the demand for leakage and cooperage should be stricken from the petition, which was refused. The plaintiff moved for a judgment for the amount claimed, except for leakage and cooperage. These motions were overruled, and the defendants filed their answer, in which, besides denying their responsibility for loss by leakage and cooperage, they show that the non-delivery of the molasses, for which the plaintiff claims compensation (except that which was lost by leakage of the barrels delivered from want of proper cooperage,) was caused by a jettison or throwing overboard of the barrels and half barrels not delivered, under circumstances in which it was deemed necessary, and ordered by the master on consultation with the other officers concerned in navigating the boat, as the only means of saving her and the residue of the cargo, the aggregate value of which, with the freight, they say, was over $90,000. And they aver that this loss was occasioned by the dangers of the river, for which they are not responsible by the bill of lading.
In excuse or justification of the jettison, they alledge that the boat left New Orleans well officered and well manned, took on board, on her way, the plaintiff’s cargo, and was duly prosecuting her voyage up the Mississippi, for Louisville, when, on the night of the 5th of February, and about five miles below Helena, in Arkansas, being under way, she run on Montezuma bar; that efforts were immediately made to back her off with the engines, and in do *672 ing so she swung broadside on the bar, and stuck fast, and was there grounded; that she run on the upper end of the bar and swung with her side on it; that all means within the power of the defendants were used to get her off, but the bar was a quicksand bar, the river was falling rapidly, and the current and wind strong against the boat and the bar, pressing the boat upon the bar, and the night was very cold ; that on account of the softness of the bar spars could not be used; that lighters of sufficient capacity to relieve the boat could not, so far as known, be procured, and the time necessary for procuring any would have exposed the boat and cargo to too much danger of loss ; that in this condition the boat and cargo were in imminent danger of being lost, and the master upon consultation, deliberately determined that the only alternative to save the boat and cargo was to resort to a jettison ; that he then caused 338 barrels and 285 half barrels of molasses, and 21 barrels of oysters in the shell, to be thrown overboard, which so lightened the boat, that with the use of the engines she was got afloat, and then proceeded on her voyage to Portland and Louisville, and delivered the remaining part of her cargo, 244 barrels and 274 half barrels of the plaintiff’s molasses having been thrown overboard; and that the part of the cargo thrown overboard was the most convenient to reach, the least valuable, and the heaviest. And the answer states that the jettison was necessary to save the boat and the residue of the cargo ; that the grounding was an unforeseen accident, inevitable and unavoidable, and happened without any fault or negligence of the defendants or their agents ; and that the loss of the molasses thrown overboard was caused by dangers of the river, for which by the bill of lading they are not liable, and that because of the jettison they could not deliver it. The defendants further say that if any loss occurred from leakage, of which they know nothing, it resulted from neglect of plaintiff’s agents on account of defective cooperage *673 and barrels, without fault on their part; and they deny that the part delivered was not in as good condition as when received. In an amended answer, filed during the trial, they state that the barrels of molasses received on board of the Glendy Burke were in bad order, and had leaked very much when the jettison took place; that some of those thrown overboard were nearly empty, and that those thrown overboard had leaked and wasted at least $-. The objections of the plaintiff to the. filing of this amendment were overruled; and to the opinion of the court overruling the objection, as well as to the other opinions before mentioned, exception was taken by the parties respectively.
The plaintiff demurred to the original answer, but the demurrer was overruled, and a jury impannelled* who, after hearing the evidence, and being unable to agree on a verdict, were discharged, and the cause was continued. At a succeding term a trial was had, which, after the exclusion, by the court, of all testimony going to show the opinions of various persons engaged in navigating steamboats on the Ohio and Mississippi rivers, that spars and anchors could not have been used with any effect at the place and in the condition in which the boat was, and under instructions from the court that the plaintiff could n.ot recover for damage by leakage and cooperage, and that the defendants had not made out the defense of a justifiable jettison, and that upon the whole evidence they must, as to the jettison, find for the plaintiff, resulted in a verdict for the plaintiff for $3,857 48 in damages, for which sum judgment was rendered in his favor. The defendants excepted to the opinions of the court excluding the evidence respecting the utility of attempting to use spars and anchors ; and also to the instruction given as to the jettison. The plaintiff excepted to the instruction'to find against his claim for loss by leakage and coo'perage, and also to the opinion overruling' his objec *674 tion to ibe competency of Jamison, the pilot of the boat at the time of the jettison.
1. Although a fact which might bar a recovery, ought properly to be negatived in a petition on a eov enant, and is not negatived, yetif in the answer it be set out and re lied upon as a defense,it forms an issue in the case, and no reversal should take place for a failure tomake the averment in the petition.
The motion of the defendants for a new trial, founded mainly upon the exclusion of the evidence above referred to, and upon the instruction to find for the plaintiff as to the jettison, having been overruled, they have brought the case to this court, assigning errors covering all the decisions of the circuit court against them. The plaintiff has assigned cross errors, questioning all of the decisions against him, except upon his motion for a judgment for all of his demand but that for leakage and cooperage.
Some of the questions thus presented are of minor importance. Others are of a magnitude not exceeded by any which can arise respecting the navigation of, our great rivers, and the rights and duties of owners and masters of steamboats navigating them with freight. Those of the former class we shall barely notice, without enlarging upon them.
Tbe defendants’ motion to strike out so much of the petition as relates to the demand for loss by leakage and cooperage, was properly overruled, because that part of the claim, and of the petition, involved the charge of deterioration of the barrels during the voyage, by tbe fault of the defendants. Besides, the object was afterwards fully answered by the instruction of the court on that subject. The plaintiff’s motion for judgment, except as to leakage and cooperage, seems to have been made soon after the demurrer to the petition was overruled, and on the same day, and immediately before the filing of the answer which removed all ground for it. The filing of the answer, though in the same order, is stated after the overruling of the plaintiff’s motion. But if the answer was first filed, and if the motion had been granted, an inquiry as to damages would have been still necessary, and the effect of the motion was substantially attained by the instruction as to the defense of jettison. The amendment of the answer made during the trial, does not appear to have been prejudi *675 eral to the plaintiff. The demurrer to the petition, which seems to have been founded upon its failure to aver that the loss for which damages are claimed was not occasioned “by fire or dangers of the river,” was,, as we are inclined to think, properly overruled, because the non-delivery of the cargo was prima facie a cause of action, and the matter of excuse or justification under the exception, seems properly to come from the defendant, within whose knowledge it lies. If the plaintiff had negatived the application of the exception, it would have been a mere formality, which would not have thrown the burthen of proof upon him, nor excused the defendant from showing, by pleading and proof, that the loss, or nondelivery of the cargo, was occasioned by one of the excepted causes. But if this were not so, and if the petition, standing alone, should have been adjudged to be insufficient for want of a negative allegation that the non-delivery hadnotbeen occasioned by one of the excepted canses, we are satisfied that the defect was cured by the answer, which, professing to set out the cause and manner of the loss, avers that it was occasioned by one of the excepted causes, and thus makes a part of the issue tjhe very fact which was omitted in the petition. And as that fact being included in the issue, must have been determined.one ■way or other as certainly as if it had been negatived in the petition, it would be worse than useless to send the case back for a formal negation by the plaintiff of a fact which was already embraced in tbe issue, and already and certainty negatived by the verdict. If, therefore, there be in such a case no error affecting the trial, and the verdict be sustained by the evidence, the court would not, after verdict, reverse the judgment for a defect of this kind, even though it might be fatal on demurrer ; because, upon tbe whole record; the plaintiff would appear to be entitled to judgment.
9. To make a vailableas a defense for a oarrier of goods by steamboat, for a casting overboard the goods, and their total loss to the shipper, the defense must allow that it resulted from the dangers of the river, which could not have been avoided, and that the,jettison was “rendered necessary by circumstances, over which the defendants and their agents and servants had no control, and which could not have been avoid ed by the exercise of that vigilaneewhich was appropriate to their respective stations, and call ed for by the navigation on which they were engaged, and when there was no reasonable means of avoiding a total loss, but by sacrificing a part of the property at risk, for the safety of the residue.”
*675 Wo pass, then, to the answer, which not only admits the non-delivery of a large portion of the plain *676 tiff’s goods-, as alledged in the petition, but avows as the cause of non-delivery, that they were- thrown into the river, and thus destroyed or lost, by the willful and deliberate act of the master and other agents of the defendants. But in order to make an act so obviously injurious to the shipper, and apparently so contrary to the undertaking and duty of the carrier, operative in itself as an excuse for the non-delivery, and a defense to the shipper’s action for the apparent breach of contract, the act itself must be shown to have been caused by one of the dangers of the river, which could not have been avoided, and to have been rendered necessary by circumstances over which the defendants, and their agents and servants employed in the navigation of the boat, had no control, which they could not have foreseen and guarded against by the exercise of that vigilance which was appropriate to their respective stations, and called for by the character of the navigation in which they were--engaged, and which, when they actually occurred, left no reasonable means of escaping a total loss but by sacrificing a part of the property at risk for the safety of the residue. If a power of such-magnitude must be conceded to the navigators of steamboats in our interior streams, it furnishes a most potent reason why not only the boats themselves should be staunch, well equipped and competent in every respeet to meet all ordinary difficulties of the intended voyage, but why, also, the masters or others, at whose discretion a portion of the cargo entrusted to their care may be destroyed with impunity, or at the common charge of all concerned, should possess that skill, and experience, and care, which would enable them, as far as practicable, to avoid or overcome danger, and that discretion and firmness which might prevent a sacrifice under the promptings of timidity, or of needless despair.
3. The fact navigating the western waters, is placed in a sit uation that in all reasonable probability a total loss will ensue, unless a jettison take place of partofthegoods, will not justify the jettison and excuse the carrier, unless the crisis come with out fault, (j. e.) without dueskill and diligence in overcoming the evil; a jettison will notbejustifiedon account of probable injury to the boat, or a -desire to expedite the trip, or if it occur from the insufficiency of the boat, or negligence, or incapacity of those engaged in navigating it.
*676 The single fact that the boat is in such a situation at the time- of a jettison, as that, in ali reasonable probability, a total loss of both vessel and cargo must *677 ensue if immediate relief be not afforded, will not justify the carrier, or his agents, in resorting to the extreme measure of easting overboard, and thus destroying, a portion of the cargo, so as to throw the loss upon ail who may be benefitted by the sacrifice, (though it be at the moment necessary, and prove successful,} unless the crisis come without fault, that is, without the want of due care in avoiding, and due skill, and diligence, and exertion, in overcoming the evil. If, by the use of proper care, and skill, and diligence, and exertion, or activity, the necessity for the sacrifice might have been avoided; or if, though the danger and the crisis could not have been avoided, tibe sacrifice is thought necessary, and is made only to prevent harm to the boat, or to expedite her on her voyage, the carrier, on account of his fault in the first case, and because in the other he alone is benefitted by the sacrifice, must alone bear the consequent loss. The carrier, even under the exception ■of dangers of the river, is responsible to the shipper, not only for losses which occur by reason of the insufficiency of his boat, or its equipments, but for those, also, which are occasioned by the incompeteney of those whom he employs in its navigation, or by the want of reasonable care, and skill, and diligence in the particular circumstances which have occasioned the loss. And that reasonable competency, including care or prudence, and skill, and diligence, is that degree of these qualities and experience which is usual among those employed in the same navigation, such as its nature and ordinary dangers and difficulties require, and which the public has, therefore, a right to expect from all who undertake the transportation of property and persons in that navigation.
4. By the common law, the common carrier was in effect an insurer against all loss, except loss by tbe ait of God, or the King’s public enemies, and jet tison was notjus tifinble unless rendered necessary by one of these causes. Subs equently an exception was introduced into the contract by carriers on sea, of the “dan gers or perils of the sea,” which denote na tural accidents peculiar to that element, which do not happen by the intervention of man, not-are to be prevented bv human prudence. (3 Kent's Com., 216,217.), The peril must appear to have occurred without fault. (Abbot on Shipping, 258.)
*677 By the common law, the common carrier, whether by land or water, and whether engaged in external or internal navigation, could excuse the non-delivery of the goods received for transportation, only by showing that it had been occasioned by the act of *678 God, or by the king’s (that is, public) enemies.— Against losses otherwise occasioned, unless by the fault of the shipper or owner of the goods, he was, in effect, an insurer. Under this rule of responsibility, a jettison, or the throwing overboard of a part of the goods, did not excuse the non-delivery, and therefore was not, as between the carrier and the shipper,justifiable, unless it was done under a necessity occasioned by the act of God or of public enemies.
The right- and law of jettison, had its origin and growth, as a law of the sea, in the navigation of which, the loss of the vessel involved not only in most instances, the loss of the cargo, but generally the loss, and always the hazard more or less imminent, of life. And we sometimes find the rule exempting the carrier from liability on the ground of this right, laid down as if depending upon or growing out of a necessity of throwing goods overboard for the preservation of the vessel and crew, in a tempest, (2 Kent’s Com., 603,) or in extremity produced by other causes coming within the common law exceptions to the undertaking of the the carrier. The extreme rigor of the rule of liability, applicable to carriers bjr sea, who necessarily incur much greater hazards than are ordinarily incident to transportation by land, has in modern times been mitigated, by introducing into the contract for transportation and delivery, the exception of dangers or perils of the sea, in addition to the two exceptions of the act of God and the king’s (or public) enemies, recognized by the common law. And as under the common law exceptions, the carrier was not liable for the non-delivery of goods thrown overboard, under a necessity caused by the act of God or the public enemies, so to give him the reasonable benefit of the exception of the perils of the sea, when expressed in the contract, he is not liable for the non-delivery of goods thrown overboard, under a necessity caused by a peril of the sea. In either case, and in the one as *679 certainly as in the other, if the jettison be rendered necessary by one of the excepted causes, as by the act of God or a peril of the sea, the loss occasioned by the jettison, is a loss occasioned by the cause which rendered the jettison necessary, and thus justified it, and is therefore a loss coming within the exception, and for which the carrier is not liable, except with all others concerned in proportion to the benefit derived from the sacrifice. But while it is generally easy to determine whether the loss has been occasioned by lightning, tempest, earthquake, or other act of God, it is often difficult (as said by Ch. Kent, 3d Com.., 217,) to determine whether the disaster happened by a peril of the sea, or unavoidable accident, or by the fault, negligence, or want of skill of the master. “Perils of the sea (same book, page 216.) denote natural accidents peculiar to that element, which do not happen by the intervention of man, nor are to be prevented by human prudence.”
5. Peril of life is not a necessary ingredient in the justificaBon of goods. ;
*679 It is more pertinent, however, and more profitable to consider the examples given by which to determine whether the disaster has happened by a peril of the sea, than to attempt any deduction from the expressions used in defining such a peril. “If, (says the same author, 3 Kent's Com., 217,) a rock or sandbar be generally known, and the ship be not forced upon it by adverse winds or tempests, the loss is imputed to the fault of the master. But if the ship be forced upon such rock or shallow by winds or tempests, or if the bar was occasioned bjr a recent and sudden collection of sand, in a place where ships could before sail with safety, the loss is to be attributed to a peril of the sea.” The same rule of discrimination, and in the same words, is stated by Abbott in his work on shipping, (page 258,) also by Story on bailments, and by other authors who need not be referred to.
Under.this rule and from what has already been said, we must conclude that if a vessel transporting-goods on the sea, under a contract containing the ex *680 ception of perils of the sea, should, by running on a bar, such as is described in,the last member of the rule, and in such a place, come without fault on the part oí the na vigators into such a perilous condition as to render it necessary for the common safety, that a part of the cargo, should be thrown overboard, such jettison would be justifiable, and the carrier would not be held responsible upon his contract, for the nondelivery of the goods thus destroyed. And although the necessity for preserving life is sometimes, it is not always referred to in stating a proper case for a jettison, (as in Abbott on Shipping, 142.) But as property alonéis destroyed by the jettison, it would seem to be sufficient in point of reason, to justify the destruction of a small part of that which is at risk, that such sacrifice was necessary for the preservation oí the residue of much greater value, though no life was at hazard, provided the necessity for the sacrifice has arisen without fault on the part of him who has charge of and is responsible for the whole. And we suppose the. preservation of life has been referred to in connection with the necessity of a jettison, rather on account of the fact that the danger of the vessel commonly involved hazard to the lives of those on board, than as a serious indication that a jettison might not be justified, unless it were necessary for the preservation of life as well as property. Surely, the master would not be justified in abandoning the ship and cargo to a total loss, merely because he and all on board could save themselves without difficulty, or were in no danger, when by the sacrifice of a small portion of the cargo, the entire residue with the ship might be saved. The fact that the hazard of life to the crew and others is involved in the danger of the vessel, would-, doubtless, increase the importance of the crisis, and render more urgent the necessity of doing whatever might be done to insure the common safety. But we do not perceive that it should be absolutely essential to the justification of a jettison.
G. The same rules, without re laxation, which apply to ajuslification for a jettison at sea, whore the perils of the sea are excepted, apply to a jettison on the Ohio and Mississippi, under the exception of the dangers of the river.
The exception of the dangers of the river in the bill of lading now before us, bears a strong analogy, matatis mutandis, to the exception of perils of the sea. And there seems to be no good reason why the same definition, with the substitution of river for sea, should not be applied to each ; nor why the same principle which determines the liability or non-liability of the carrier by water, under the one exception, should not also determine it under the other. The principle that the carrier should provide a vessel,' in strength and equipments suitable to the voyage which he undertakes, and that he should furnish her ; with officers and men, competent in number, and in the qualities requisite for the particular navigation, is alike applicable to both cases; and there can be no ground for discrimination upon the question of bis liability for a loss occasioned by a want of reasonable care, or skill, or diligence in those whom he has employed as his agents in the transportation of merchandise. Nor should there be any as to his non-liability for accidents peculiar to the element on which his vessel is borne, and to the navigation he is engaged in, and which do not happen by the intervention of man, nor are to be prevented by human prudence. By which we understand that degree of prudence which is usually found in discreet men, under similar circumstances, and is to be reasonably expected from those who are engaged in the particu-’ lar navigation.
There are, it is true, differences between our rivers and the sea. But although these may produce a difference in the circumstances of the case, and some difference or even difficulty in the application of the same principle of liability or non-liability, we do not perceive that they should necessarily produce any difference in the principle itself. It is said that there are maps and charts of the ocean, by which the navigator is shown the course which he should pursue, aud the dangers which he is to avoid. But the new discoveries continually made, and the constant im *682 provements and additions to existing charts, show that the great ocean is yet but imperfectly explored, while the numerous shipwrecks annually occurring, show how little maps and charts avail against rocks and winds and storms, to which the navigation of the sea is subject. And what are maps and charts, even as guides upon the ocean, which must forever remain trackless, compared with the shores of our rivers, always in sight of the navigator, and with the successive objects upon them, soon becoming familiar, and which, as landmarks, enable him at a glance to know not only where he is, but what known obstacles or dangers he is approaching. The narrowness of the rivers, too, while it facilitates his knowledge of the stream and its obstructions, or other difficulties, diminishes the danger which might otherwise arise from an accident produced by a peril of the river, and not involving the immediate destruction of the boat, by the facility which it furnishes, from the proximity of the shore, of removing persons and property to a place of safety. We find in the comparison thus far, nothing which should relax in favor of the carrier upon the Mississippi and Ohio rivers, the rule of diligence and skill, or the principle of liability, as established with respect to carriers by sea, under the exception by contract, of perils of the sea. And to pursue the parallel still further: If the rivers have currents, and are subject to winds and storms, which may counteract the efforts and skill of the helmsman, and drive the boat from its course, and ground or strand her: so there are currents and tides in the ocean at least as strong, and winds and tempests much more powerful, occurring, too, when there is no port or shore or anchorage at hand, which may afford protection. So, if there are islands, and bars, and shoals, and snags, in the rivers, there are also islands, and bars, and shoals, and rocks, open or concealed in the ocean; and if there may be new formations of sand in the rivers, there may also be in the sea new formations, not only of sand, but of *683 rocks thrown up by volcanoes, and which are either raised above or remain concealed beneath the surface of the water.
7. If an obstruction in the river be known, and a vessel run upon it, or upon the shore, without beingdriven by force of wind or current of the river, which could have been prevented by proper care and skill, a jettison will not be justified. By known obstructions is meant, such as were known to navigators of the stream generally, or to the navigators of the particular boat, or discoverable by them by the exercise of reasonable vigilance. (See 4 Yerqcr, 57; 5 lb. 7, 7 lb. 340.)
*683 It is to these circumstances, as to which, so far as they may effect navigation, there is a considerable analogy between the rivers and the sea, that the rule quoted from Kent and Abbot applies. The obstructions themselves may be considered as natural causes or facts, existing without the intervention of man, and peculiar to the element, whether sea or river.— And although the obstruction be known, yet, if not-' withstanding the exercise of reasonable care and skill, the vessel be driven upon it by extraordinary wind, or tempest, or as we add, by the current of the river, whose force and direction could not have been reasonably anticipated, nor its effects avoided by proper skill and exertion, all of which are natural forces; or if the obstruction be unknown, and be at a place where vessels passed before in safety, the accident of the vessel in either case, running and grounding upon such obstruction, without fault of the navigators, is attributed to a peril of the sea, if the navigation be upon the sea, or should equally, as we think, be attributed lo a danger of the river, if the navigation be upon it.
But if on the other hand the obstruction be known, and the vessel run upon it without being driven on it by the superior natural force of wind and tempest, the law of the sea makes the carrier liable for any loss occasioned by the accident, upon the assumption that not being the result of the superior force of natural causes, it might have been prevented by human prudence, that is, by the exercise of reasonable care and skill, and is tobe attributed not to a peril of the sea, but to the fault or deficiency of the navigator. And to the application to the carrier on the river of this braneh of the rule, with the qualification, of adding the current of the river as one of the natural forces which might, by counteracting the reasonable exertions of care and skill on the part of *684 the navigator, and without fault cn his part produce the accident, there can, in our opinion, be no reasonable objection, unless the carrier on the river is to be absolved from the exercise of reasonable care and skill. We think the carrier is to be held liable for every loss occasioned by an accident, which, by the use of reasonable care a.nd skill, and prudence, by the navigator of his vessel, might have been prevented. And, therefore, we have, in our exposition of that branch of the rule -which excuses the carrier, for the vessel being driven by winds, &c., upon a known obstruction, expressed the qualification, necessarily to be understood in the rule itself as quoted, that the accident must occur, notwithstanding the exercise of reasonable care and skill to prevent it.
It will be observed that we have included among the obstructions which may aid in causing an accident, attributable to dangers of the river, not only islands, and bars or shoals, but also snags, and we say, the shore itself. The principle being, that if the boat, while pursuing the usual course or channel, runs and grounds upon one of these obstructions, which is unknown to navigators, the accident is attributed to a danger of the river, hut if it run upon one which is known, it is not attributed to that cause, unless it be driven upon it by one of the natural forces to which we have referred, and notwithstanding the reasonable efforts of the navigator. The same principle of discrimination between the known and the unknown, applies to the shifting of bars, or the formation of new ones by the rising and falling of the river. But as this property or habit of the river, as well as its ordinary currents, and the effect of ordinary winds should be known, and must be presumed to be known to the navigator, a corresponding degree of caution is requisite, in approaching and passing those places, in which such changes may be expected in the bed of a falling river, and in which the course of the boat may be effected, even by ordinary winds and currents.
*685 We have only to add upon this subject, that in! speaking of unknown obstructions, we refer to such as were neither known to navigators generally, nor ' to the navigators of the particular boat before the > accident, nor discoverable by them by the exercise of reasonable vigilance on their part, and in time to' have avoided the accident. If the obstruction be thus unknown, the accident of running upon it may properly be regarded as one which could not have been prevented by human prudence or foresight. But if it be actually known to the navigator of the boat, or if being generally known he ought to have known it, or if he might have known it by the use of reasonable vigilance, then, unless the boat be driven upon it by superior natural force, against his proper exertions, it is not such an accident as human prudence and foresight could not have prevented, and is, therefore, not attributable to a danger of the river. The same principle may be applied with regard to winds and currents, with a discrimination between what is ordinary, and should be known and provided against, and that which is extraordinary and not to be anticipated. The conclusion to which we have come in reference to this exception of dangers of the river, and to the. criterion of the carrier’s liability, though opposed in some degree to the case cited from 11 Missouri Rep., 299, of Collier vs. Valentine, is accordant with the general current of cases cited upon this subject by the counsel for the carrier, and especially with the cases cited from 4 Yerger, 57 ; 5 Yerger, 7; and 6 Yerger, 340, as quoted by him.
It was necessary that the answer which admitted and professed to justify the non-delivery of a large portion of the plaintiff’s goods, and to present a defense under the exception of dangers of the river, should state facts which would show not only a necessity for throwing the goods overboard, when it was done, but also that this necessity was caused by a danger or by dangers of the river.
8. The answer to a petition to recover damages for a loss by the goods being east overboard by the carrier, to be good, mnsd show all the facls necessary_ to justification' of the jettison. The averment that the loss occuvvvd by tbo1 dangers of the river is not suf e'ent. It is bit a conclusion of law.
The allegation that the accident and loss were occasioned by dangers of the river, is an allegation of a conclusion of law arising upon certain facts, and ,the facts themselves should have been stated. The averment that the accident was unforeseen, and inevitable or unavoidable, presents no distinct fact. These terms are themselves but conclusions from facts which should have been stated. The iact or facts which prevented the danger from being foreseen, and those which made it unavoidable and rendered it inevitable, should have been shown with reasonable precision and brevity. For we are not requiring a statement of the evidence by which the ■facts may be proved, but a statement of the material facts on which depend the conclusions of law relied on in the defense. An accident may have been unforeseen, and may, under the particular circumstances, have been at the moment unavoidable and inevitable, and yet may not be properly attributable to dangers of the river ; and it will not be attributed to that cause, if by the exercise of reasonable care and skill, it might have been foreseen and avoided.
The boat, in ascending the Mississippi in the night, ran on Montezuma bar. Without drawing any inference of notoriety froxp the fact that the bar bad a name, it is evident, from what has been said, that the running upon it was not an accident attributable to a danger of the river, unless the bar being a new formation or in a new place, was unknown, (in the sense in which we have explained that term,) and was not visible nor discoverable by reasonable vigilance, in time to be avoided; or unless, although it was known or thus discoverable, the boat was, without fault of the navigators, driven upon it by the wind or the current, which counteracted tlie reasonable exertions of those who were conducting it. The operation of these natural forces in producing the collision, seems to be absolutely negatived by the fact that the boat was going up stream when she struck the bar, while not only the current, but the *687 wind also, as alledged, were driving in the opposite direction. The striking or running on the bar which thus occurred in going up stream, may be assumed to have been caused by the power of the engine and the force of steam, presumably under the control of those on board. It was therefore necessary, in order to bring that collision within the exception of dangers of the rivers, to show that the bar was anew formation where boats had before passed in safety, not generally known, and not known to those having the direction of this boat.
Again, as the boat ran upon the bar in her ascending progress, the presumption is, that she ran upon it with her bow upstream; and in that position, the engine being reversed to back her off, she would, when got afloat, be naturally and rapidly impelled, stern foremost, down the stream, by the concurrent forces of the wind, the current, and the engine. And yet in pursuing the narrative of the disaster, as presented in the answer, we find it said that in endeavoring to back her off with the engine, the boat swung broadside upon the bar, stuck fast, and was then grounded. All this was certainly strange and inexplicable, if it happened while her bow was still aground on the bar, which it must have struck on the lower side, and while the boat was operated on by the current, and wind, and steam, all tending to keep her in a direction up and down the channel. But the answer says she ran on the upper end of the bar, and swung with her side on it, the wind and current pressing her on the bar. Of course, this could not have happened, either while the bow was fast where it first struck, and the stern down the stream, or while the boat was actually moving up stream, bow foremost. It must have happened after she was got afloat from the first sticking, and while going down the stream before the engine was reversed, or before it had given her a new headway up the stream; and while thus descending, her stern may have struck on the upper side of some other part of the same or of *688 another bar, and her bow swinging round by force of the wind and current, bearing it downward. She may thus have been found broadside upon the bar.
This, according to the evidence, was substantially the actual course of events. There seems to have been in fact, as from the answer there may be infei'red to have been two collisions, or accidents; the first while the boat was ascending the stream, when probably the bow run upon a bar; the other after she had been got afloat from the first striking, and before recovering her headway, when descending the stream stern foremost she struck another bar, or a different part of the same, and having swung round, came into the position in which the jettison was rosorted to, and as alledged, under a necessity then existing, to throw a part of the cargo overboard, as the only practicable means of saving the residue and the boat itself. But in order to show that this necessitjr, if it existed, and the consequent loss and non-delivery were occasioned by dangers of the river, and therefore within the exception in the policy, it was necessary to show not only that the extreme peril of the boat was the unavoidable consequence of this second striking, and of the action of the wind and current on the boat, not to be averted by reasonable skill and exertion, but that the second striking itself was upon a recent formation, or unknown bar; or that it was caused by force of the wind and current, and in either case without fault on the part of the navigators. And if the situation of the boat which rendered her liable to an accident, not consistent with her proper motion up stream, and which therefore should be accounted for, was the consequence of the first sticking, it should have been shown that reasonable care and skill and exertion, were used in getting the boat off from the first sticking, and in avoiding the second as well as that of the first sticking, was itself caused by danger of the river. And if the part of the river where these accidents occurred, was on account of the number or *689 extent and shifting character of the bars, particulariy intricate and dangerous, this fact instead of authorizing a relaxation, required an increase of care and skill, and diligence. And finally, if the second striking and the grounding of the boat with her broadside on the bar, where the wind and current were pressing her upon it, be accounted for and traced to dangers of the river which could not have been prevented by human foresight, it would still be necessary to show what particular fact or circumstance beyond the control of the navigators, caused to the boat in the condition described, such imminent danger of immediate destruction, as rendered it necessary for the safety of boat and cargo that a part of the latter should be thrown overboard. And it should be shown that before this extreme measure was resorted to, all other practicable means were tried; or if any usual means were omitted, the cause of such omission should be stated.
The answer when subjected to these tests, growing out of the principles which we deem applicable to the subject, is found to be substantially defective in failing to state facts which authorize the conclusion that either the first or the second striking of the boat was attributable to a danger to the river, and not to the fault of the navigators, and iii failing to state the facts which constituted or caused the immediate and imminent danger to the boat and cargo, to be avoided only by a jettison, and which, while they forbade delay, which in many cases might bring relief, prevented the resort to other means of safety rather than to the sacrifice of a valuable part of the cargo. The manner of determining on and making the jettison as stated, seems to be subject to no reasonable objection. But the fact that the master and the officers whom he consulted, thought the jettison necessary, did not make, and do not conclusively prove it to have been so; and as the propriety of their decision and conduct must be passed upon by a court and jury, to whom the questions as to the *690 cause of the loss and the liability of the carriers are to bo submitted, it is necessary that the facts relied on to justify their acts and to repel the liability, should be presented in pleading to the court which is to pass upon their sufficiency, as well as in evidence to the jury which is to pass upon their truth.— It may be, indeed, that the carrier may apprehend some disadvantage in submitting to tribunals deliberating in ease and security, the decision upon facts and conduct occurring in the midst of dangers and difficulties, to be fully estimated by those only who encounter them. But the apparent severity of this ordeal is mitigated by the consideration that the law while it does not countenance or justify rashness or inordinate timidity in those who undertake the affairs of others, yet requires from them by implication, nothting more in judgment or action, than that which under the circumstances is reasonable, and may be justly expected from men of ordinary prudence and qualification for the undertaking) and that by confiding the ultimate decision of the facts to a tribunal composed of ordinary men, and by admitting all such pertinent testimony as may elucidate the conduct and motives of those concerned, it ensures the application of this humane and reasonable principle, in the trial of the questions which are to be decided. If when a fatal accident occurs, the main circumstances exist which may characterize the loss as attributable to a danger of the river, if produced without fault or negligence, the court pronouncing the law, must inform the jury that reasonable care and skill and exertion is all that is required from the navigators^and and there is little danger that the jury will subject their judgment or conduct in a crisis of danger, to an unreasonable test, or require from them more than under the circumstances should be expected from ordinary men, professing the skill and discretion appropriate to their station and business.
9. But ifa justification be alledged in general terms, which embraces the particular facts necessary to be proved, and the parties go to trial upon that issue, and evidence offered conducing to show facts, upon the finding of which to be true, the jury might have found for the defendants, and a judgment thereon would have been a bar to any future action, Y et, the. defend ant should not be prevented from questioning the decision of the court, on the ground of errors occurring du* ring the progress of the trial which may-have produced' a verdict against them.
*690 But although the answer is deemed insufficient, because it does not state the particular facts which *691 are essential to the justification relied on, yet as it does state that the loss was caused by a danger of the river, and by an accident unforeseen, unavoidable and inevitable — that all available means were used for the relief of the boat, showing why some particular measures were unavailable and not resorted to, and that the danger of total destruction 'was so imminent and immediate as to render the jettison necessary for the common safety — and as these general statements, which did in fact include the facts which should have been stated, were adjudged to be sufficient on the demurrer, whereby the defendants were prevented from making amendments which they might have made if the demurrer had been sustained ; and as, under the opinion of the court overruling the demurrer, the parties went to trial as upon a valid issue; and as the answer, though defective for want of particular statement, covered in fact the ■whole case, and was so considered and treated on the trial; and as the evidence introduced by the defendants, and that which was offered and rejected, conduced to prove facts on which the jury might have found a verdict for the defendants, and the judgment thereon would not have been reversed because the auswer did not state facts which, being included in its general statements, and therefore in the issue, must have been proved to authorize the verdict, and should have been considered as established by it — we are of opinion that they should not be precluded, by the insufficiency of their answer, from questioning the judgment against them, on the ground of errors in the trial, which may have prevented a verdict in their favor, or from reversing the judgment, if there were such errors. As the answer, although insufficient on demurrer, would have sustained a judgment for the defendants if the verdict had been in their favor, its insufficiency is not such as to justify an affirmance of the judgment against them on that ground alone.
It). The defendant in a suit for a loss by jettison, should in his defense be allowed the benefit of proving the fact of a eon sultation with the oflieers of the vessel, and of their opinions then expressed with respect to the condition of the boat, and probable means of relief, as showing only that the jet tison was deliberately made, & in view of the actual circumstances of the case as understood by those best acquainted with them. These facts are not conclusive, however, as to the necessity of the jettison.
*692 We, therefore, proceed to inquire into the alledged errors prejudicial to the defendants committed during the progress of the trial. The principal and most important of these alledged errors consists in the rejection by the court, in the various forms in which it was presented, of all evidence offered by the defendants which tended to prove, by the opinions of witnesses experienced in the navigation of steamboats on the Ohio and Mississippi rivers, that spars and anchors could not have been used, with any practical advantage, towards the relief of the boat, in consequence of the softness of the bar or sand on which the boat was grounded broadside.— It is not shown that any attempt was in fact made to use spars or anchors for the purpose of getting the boat free from the bar; and it is suggested that the evidence of opinion was rejected, because the attempt to use them was deemed to be the essential and exclusive test of their practical utility, and that this test not having been resorted to, or even attempted, the court was of opinion that the failure could not be justified, nor the actual experiment substituted by mere genernl evidence of opinion, and that spars and anchors being the usual means of relieving a boat when aground, the failure to attempt their use in this case, was such a neglect as of itself to prove the absence of that care, or skill and diligence, or exertion, which the occasion required, and which were necessary to a justification of the jettison.
But while the law requires the use of all practicable means of relieving the boat from distress before resorting to a jettison, we know of no rule which makes the use of any particular means indispensable ; and if in point of fact the nature of the bar was such that spars and anchors could not be used at all; or if the situation of the boat, and the circumstances existing at the time, were such that spars and anchors, if they might be used at all, could not be used with any prospect or hope of relief, or of ma *693 terial or timely benefit, we know of no principle or rule of law which requires that fatigue, and exhaustion, and exposure should be incurred for the mere name of diligence in making an attempt which reason and experience determine to be hopeless and useless. The modes of using spars and anchors as means of relieving boats when aground — the practicability of using them in particular places of a peculiar character, and their general effect on that which may be expected from them under various circumstances, are matters of skill and experience belonging to the particular art, as to which those who have skill and experience in the subject may, according to the general principles of evidence, express their opinions, either upon facts known to and stated by themselves, or upon facts hypothetically stated to them and proved in the cause by other witnesses.
But at last these opinions, to have any value, must rest upon facts, to be proved as facts, and not as mere matters of opinion. Upon the question whether spars and anchors could be used at all at the place where the boat was aground, the principal fact upon which opinion might be founded, relates to the nature of the bottom, and of the bar or sand at that place, as being of such rarity or density that anchors could or could not take hold upon the surface, and that spars could or could not find a foundation or resting place within the proper distance from the application of the power. The fact as to the density of the sand of which the bar was composed, might be imperfectly or inferentially proved by those who had a general knowledge of it from previous experience. But this general inference, or even knowledge, would hardly account for or excuse the entire neglect of spars and anchors without making some actual test, if opportunity allowed, of the precise nature or condition of the sand composing the bar on which the boat was aground, in order to ascertain whether spars and anchors, or either of them, could be used. The nature of the bar being proved, the *694 question whether spars and anchors could be used at all or not, would scarcely require the skill of an expert for its solution. But the question whether, if the nature of the bar presented no absolute hindrance to their use, the situation of the boat was such as precluded all reasonable expectation or chance of relief by that means, is a much more complicated and difficult question, requiring not only a knowledge or detail of the existing circumstances, but a large share of skill and experience in the management of boats, and in the means of relieving them. And as the opinions of persons possessed of this skill and experience, would often furnish the only means by which ordinary men, unskilled in the particular subject, could come to a just or satisfactory decision, the necessary alternative seems to be, either that no circumstances can excuse the failure to attempt the use of spars and anchors, where there is a possibility of making the attempt, however hopeless it may be, or that the carrier must be allowed to prove, in the only manner in which it can be proved without actual experiment, that the attempt would have been hopeless and useless. ¡‘ It has already been said that the law requires nothing more than reasonable, that is, suitable skill, and care, and exertion. It does not expect or require that the navigators of the particular boat which has met with loss, should possess or display extraordinary, much less superhuman faculties. It does not hold them, or their employers, liable for their omitting to do what other persons of skill and discretion, in the same employment, would not, under like circumstances, have done or attempted. As all, or each set of, navigators must act upon their own judgment of what, under the actual circumstances, is useful or practicable, so the common judgment or opinion of men of competent skill and discretion, in the art or profession, seems to be the appropriate and peculiar test of that which is reason\able, and of that which should be required of each And as these opinions are subject to the ultimate *695 judgment of the jury or other triers, as well with respect to their own reasonableness, as with respect to the competency and impartiality of those who deliver them, there would seem to be less danger that the jury would be led into mistake when aided by the enlightened opinions of skillful men, than if left to their own judgment upon the mere facts of the case.
The real question in this branch of the case is, whether spars or anchors could have been used with any effect towards the relief of the boat in her actual situation, or whether the failure to use them contributed in any degree to produce, or continue, or increase the danger which was the ground of the jettison, and of the consequent loss. And this question1, is one not of law, but of fact, to be decided by a jury, upon such evidence of facts and opinions as, according to the general principles of evidence, is appropriate to such a question, involving the exercise of judgment and skill, and which can only oecur in a* particular employment or business of art. And as it is understood to be the duty of the master, before making a jettison, to consult the other officers on board, if there is opportunity for so doing, we think the carrier, on the question of his liability for the loss, is entitled to the benefit of the fact that such consultation was had; and, also, of the opinions then entertained and expressed by the officers in charge of the boat, to be proved by those who expressed them, if their evidence is attainable, and, if not, by others who were present, or had knowledge of them. But this evidence should be admitted no farther than to prove the judgment or opinion of the individuals referred to, as expressed at the time, with reference to the actual condition of the boat, and the probable or possible means of relief. And even to this extent it would be admissible to prove only, that the jettison was made deliberately, and upon consultation and advice, in reference to the actual circumstances and necessities of the case, as understood by those *696 who were best acquainted with them, and were bound to act. It may, indeed, be doubted, whether these opinions, on which, as expressed at the time the jettison was made, were not a part of the res gestae, and proveable as such by the testimony of those who heard them. But, be this as it may, they are certainly not conclusive either as to the condition of the boat, or the possible means of relief, or the propriety or necessity of the jettison at the time. And they are inadmissible as to the manner in which the boat was placed, or brought into the situation in which the jettison was thought necessary.
II. A pilot is a competeufc witness to testify in behalf of the managers of a steamboat sued for loss by jettison alledgedto be unjustifiable.
The court having excluded testimony which, according to the foregoing opinion, was admissible, and upon which, in connexion with the evidence before them, the jury might have found a different verdict, the judgment ought to be reversed and a new trial had, unless this court should assume conclusively, which it cannot properly do, that the non-delivery of the plaintiff’s goods was caused by the fault of the defendants or their agents, and not by a danger of the river, and an accident occasioned thereby, which could not have foreseen or avoided.
Upon the cross ei’rors, so far as not already disposed of, we remark, that there is no foundation in the record for the complaint that the court improperly overruled the plaintiff’s motion for judgment (on the answer of the defendants held good on demurrer,) for the amount to which he would be entitled upon, a settlement of the general average, in case the jettison, as alledged in the answer, was rendered necessary by a danger of the river, and which it is contended the master was bound to ascertain and secure. The record does not state that any such motion was overruled, or even made. And if the motion had been expressly made and overruled, we are far from being satisfied that in an action in which the plaintiff claims damages for non-delivery of goods according to the bill of lading, judgment could be claimed upon an entirely different liability, *697 which might grow out of facts presented in the answer, as a bar to the actual demand. We have, therefore, deemed it unnecessary to enquire, and certainly unnecessary to decide, whether, in a case of justifiable jettison, constituting a justification for non-delivery of the plaintiff’s goods, the master is bound to ascertain and secure the amount due to the plaintiff as a general average, and the carrier is liable for a neglect of this duty. Some allegation of the breach of this duty, if it be one, would seem to have been necessary to fix the liability; and as it was not essential to the answer, as about the present action, that it should show that the master had done anything in relation to the general average, its silence on that subject could not possibly form the basis of a judgment for the plaintiff’s share.
A more serious question is presented by the complaint that the court improperly overruled the plaintiff’s objection to the competency and admissibility of R. Jamison, the pilot who had chai'ge of the boat when she first struck, and when, in backing off, she was finally grounded, and who was allowed to testify as a witness in this case, without a release. This objection is founded upon the rule laid down in the books on evidence, and established by numerous adjudged cases, that in an action against the principal, for damage occasioned by the neglect or misconduct of his agent or servant, the latter is not a competent witness for the defendant, without a release, (Green-on Evidence, sec. 394,) and the reason is thus stated by the author referred to : “For he is in general liable over to his master or employer, in a subsequent action, to refund the amount of damages which the latter may have paid.” And of the amount of damages recovered against the employer, the record will be evidence against the agent, though he may not have been required to defend the action. This rule is said, in the section quoted, to apply to the relation of master and servant, wherever, in its broadest sense, it may be found to exist; and among other" *698 cases stated, is the case of a pilot in an action against the captain and owner of a vessel, for mismanagement while the pilot was in charge; or to a ship master, in an action by his owner against underwriters, where the question was whether there had been a deviation, neither of whom, says the author, is competent to give testimony, the direct legal effect of which will be to place himself in a situation of entire security against a subsequent action.
In this case a judgment of damages against the defendants would not be evidence, for any purpose, against the pilot, in a subsequent action by his employer, because the judgment and damages might be founded wholly upon the impropriety of the jettison as being unnecessary, whether there had or not been any neglect or misconduct in the pilot’s management of the boat. This ground of objection to his competency has, therefore, no application to this case.— And although a verdict for the defendants might secure him from responsibility to them for the present loss to the shipper, it does not necessarily follow that it would secure him from responsibility to them for any injury they may have sustained, independently of the jettison, by his negligence or misconduct in some stage of the same disaster. Nor is it certain that the same standard of skill would be applied in an action by the carrier against the pilot, as in an action by the shipper against the carrier, who may-have employed a pilot known to possess less than ordinary or proper skill. For these reasons, and because in most cases of disaster in the night, as in the present case, the pilot at the wheel, and necessarily on the lookout, may be presumed to be the only person who knows with accuracy the causes by which it was produced, we think the court did not err in deciding that the witness was competent, however the objections might go to his credit.
With respect to the defective cooperage, and the leakage complained of, we concur with the circuit court in the opinion, that on the evidence in this re *699 cord, the plaintiff had no right to recover anything on this account, because the defect existed when the barrels were received, with an express condition of non-liability therefor; and it does not appear that the defect, and consequent loss, was increased by any fault of the defendants or their agents. But on this subject we go still further, being of opinion that so far as at the time of the jettison, the barrels and half barrels thrown overboard, had, without fault of the defendants, lost thoir proper guarantees, the defendants, even though the jettison be found not to be fully justified, and not a bar to the action of nondelivery of the barrels thrown overboard, are still entitled to a deduction on account of the loss in quantity from the barrels thrown overboard, by reason of the leakage from them, which, without their fault, had occurred before the jettison; which deduction, though it may not be precisely ascertainable, should be made by the jury, upon such data as the evidence may furnish, and should go in diminution of the damages.
12. The owner fora jettison, should be oredited by loss ansing from leakoFde°fectCin°the 7®?8®^ ’ wj“en
Wherefore, the judgment is reversed, and the cause remanded for a new trial according to the principles of this opinion, as preparatory to which the defendants may amend their answer.