THE ONTARIO.

*(District Court, E. D. Michigan.   January 2, 1889.)*

1. MARINE INSURANCE—THE POLICY—EXEMPTIONS—NEGLIGENCE OF INSURED.
    Under a marine policy exempting the underwriter from liability for "all perils, losses, misfortunes, or expenses consequent upon, or arising from, or caused by, * * * the want of ordinary care and skill in navigating said vessel," the insured cannot recover general average expenses incurred in rescuing the vessel from a peril brought about by negligence in her navigation.

2. SAME.
    Where a vessel was negligently run ashore, and, a storm coming on, was voluntarily scuttled to save her from total loss, and other general average expenses were subsequently incurred, *held*, that the stranding, and not the storm, was the proximate cause of the loss.

*(Syllabus by the Court.)*

In Admiralty.

This was a libel by the Northwestern Transportation Company, owner of the Ontario, against the Boston Marine Insurance Company, to recover a general average loss. The facts connected with this loss were substantially as follows: The propeller Ontario, valued at $55,000, was insured against total loss and general average only in five companies, of which the respondent was one. The policy in suit contained the following exception to the general liability of the respondent as insurer:

"Excepting all perils, losses, misfortunes, or expenses consequent upon, or arising from, or caused by, the following or other legal excepted causes: * * * Damages that may be done by the vessel hereby insured to any other vessel or property; incompetency of the master or insufficiency of the crew, or want of ordinary care and skill in navigating said vessel, and·in loading, stowing, and securing the cargo of said vessel; rottenness, inherent defects, overloading, and all other unseaworthiness; theft, barratry, or robbery."

On the 11th day of October, 1883, the propeller, laden with a large cargo of miscellaneous merchandise, left the port of Sarnia, Ontario, bound for Duluth. While endeavoring to enter the harbor of Southampton, on the east shore of Lake Huron, and while running at her ordinary speed of nine or ten miles an hour, in a dense fog, the propeller took the ground upon a shoal near what is known as "Nine Mile Point," a short distance from Southampton. She stranded hard and fast, and in her struggles to relieve herself, broke her wheel and shoe. Efforts were made to get her off by the officers and crew, but, failing so to do, they sent for lighters and tugs, and notified the insurers. Before the arrival of the tugs, the wind and sea increased so much, and the steamer began to pound so heavily, that it was found necessary to open the seacocks, and allow her to fill and settle to the bottom. This was done, and thereby the cargo was greatly damaged. Soon after she was scuttled, a wrecking agent representing the underwriters appeared upon the scene, and took charge of the work. She was subsequently gotten off, and, with her cargo still aboard, taken to Sarnia. The owner, claiming that there was a general average loss, caused an adjustment to be made, and filed this libel to recover the propeller's share of the damage done to the goods by water, and the expense of releasing the vessel. The insurance company defended upon the ground that the loss was occasioned by negligence, and was within the exception of the policy.

*Moore & Canfield*, for libelant.

*H. H. Swan*, for respondent.

BROWN, J. At the time this case was originally submitted the principal argument of the respondent was addressed to the point that the action had not been brought within the time required by the policy. The question was indeed raised that the libelant was not entitled to recover by reason of the exception in the policy of losses and perils occasioned by negligence, but the point was not dwelt upon or considered with the care its importance demanded, and an interlocutory decree was ordered for the libelant without much reflection. The case comes now before the court upon the report of the commissioner, to whom it was referred to compute the damages, and I am now asked to reconsider the question of liability as if it had never been determined. As no objection has been made by the libelant, I am quite willing the case should take this course.

1. There can be no doubt in my mind that the master was guilty of gross negligence in approaching the land, and in endeavoring to enter the harbor of Southampton at the speed of nine or ten miles an hour, in a fog which he admits himself to have been very wet, dense, and heavy, —"as thick a fog as we ever have on Lake Huron;" and if the loss had been total, libelant would not have been entitled to recover by reason of the exception in the policy exonerating the insurer from liability for all perils, losses, misfortunes, and expenses arising from the incompetency of the master or the insufficiency of the crew, or want of ordinary care and skill in navigating the vessel. This question was fully considered by this

court in the case of *The Spartan*, reported under the name of *The Riche-lieu, etc., Navigation Co.* v. *Insurance Co.*, 26 Fed Rep. 596. Other cases to the same effect are *The Portsmouth*, 9 Wall. 682; *The Costa Rica*, 3 Sawy. 538.

In this case, I do not understand it to be seriously claimed by the libel-ant that it can recover for damages occasioned by the stranding of the Ontario. These are excluded both by reason of the exemption of the underwriters for all losses directly caused by the negligence of the master, and because the policy does not cover cases of particular average or partial loss. But it is insisted that its right to recover general average expenses is not impaired by the negligence attendant upon the original stranding of the propeller, because the proximate cause of these losses and expenses was the voluntary sacrifice occasioned by the scuttling of the steamer, which is all that is necessary to lay a foundation for a claim for general average. The real question then is, can the insured, under a pol-icy exempting the underwriters from perils and losses consequent upon and arising from or caused by negligence, recover general average ex-penses incurred in rescuing the vessel from a peril produced by negli-gence in her navigation?

(1) If this were an action by the ship-owner against the owner of the cargo for a general average contribution, we apprehend that it would be a suffi-cient answer to show that the necessity for the sacrifice was occasioned by the negligence or unseaworthiness of the ship. We understand the law to be as stated in Gourl. Gen. Av. 15, that "if the necessity for the general av-erage act arises through the unseaworthiness of the vessel, the *vice propre* of the cargo, or the negligence or barratry of the master or crew, no con-tribution generally would be due. If the danger and the necessary sac-rifice are produced by the fault of the vessel or captain, and the vessel appears as a claimant for contribution, it would seem a proper answer that he by whose neglect the loss had been produced should bear it without relief." See, also, Lowndes Av. 138; *Chamberlain* v. *Reed*, 13 Me. 357; *The Ann Elizabeth*, 19 How. 162; *Ross* v. *The Active*, 2 Wash. C. C. 226; *The Jenny Jones*, Deady, 82; *Bentley* v. *Bustard*, 16 B. Mon. 643; *The Norway*, Brown & L. 377; *Schloss* v. *Heriot*, 14 C. B. (N. S.) 59. There can be no doubt in my mind, under the facts of this case, that if the owners of the cargo sacrificed had sued the vessel and her owners, they would have recovered not merely a general average contribution, but the entire value of the property. In other words, this principle is but a re-statement of the general doctrine that a loss produced by a peril of the sea consequent upon negligence will be deemed a loss by negligence, and not by the act of God. *The Portsmouth*, 9 Wall. 682; *The Hornet*, 17 How. 100; *Davis* v. *Garrett*, 6 Bing. 716; *Williams* v. *Grant*, 1 Conn. 487; *Crosby* v. *Fitch*, 12 Conn. 410.

Is the same rule to be applied as between the ship-owner and the un-derwriter? There is no doubt that, in the absence of a special provision in the policy, the underwriter is liable for the consequences of all negli-gence on the part of the master and crew not amounting to barratry or unseaworthiness. 1 Pars. Mar. Ins. 381.

The fairness and justness of exemptions for negligence in policies of insurance may admit of considerable doubt; but so long as ship-owners will consent to accept such policies, they must expect that courts will give them the construction ordinarily put upon similar exemptions. The remedy, if one be needed, must be applied by the legislature, and not by the courts.

The clause in this policy excepts from the general liability of the underwriter all perils, losses, or expenses consequent upon or arising from or caused "by the want of ordinary care and skill in navigating the vessel," and if, in answer to this, it be said that the immediate, proximate cause of the loss in this case was a peril of the sea, the defendant may justly reply that the policy also excepts all "perils" caused by negligence. It would seem to follow that, if the vessel had been brought into peril by the negligence of her master, the general average expenses incurred in rescuing her from that peril, also fall within the exception of the policy. Indeed, if the vessel be liable, and the insured be exonerated for all damages done directly by the stranding, it is difficult to see why the same rule should not be applied with regard to losses and expenses incurred in rescuing the vessel. It is not less an "expense" or "loss" caused by, arising from, and consequent upon the original negligence, by reason of the fact that it was voluntarily incurred. Had the negligent act ceased its operation and effect, or had there been a distinct intervening pause, such as fire or collision, the damages consequent thereon would undoubtedly be attributed to such intervening cause. Such was the case in *Insurance Co.* v. *Adams*, 123 U. S. 67, 8 Sup. Ct. Rep. 68. In this case there was an exemption of liability for all losses "arising from or caused by * * * barratry, * * * or occasioned by the bursting of boilers, the collapsing of flues, explosion of gunpowder, or derangement or breaking the engine or machinery, or any consequence resulting therefrom, unless the same be caused by unavoidable external violence." The evidence showed that on the arrival of the steamer at Louisville the master gave the usual signal, which was transmitted to the engineer, that he had no present need of the engine. The joint of the mud-valve was out of order, threatening damage to the cargo, and making repairs necessary. The steam was thereupon blown off in order to make repairs. The captain, coming on board, saw that repairs were going on, and knew that the mud-valve connected with the boiler needed repairs. He subsequently went on deck, and without making inquiry of the engineer as to the condition of the steam, or receiving any notice from him that the steam was ready, gave the signal to let go the boat. At that time there was not sufficient steam to propel the vessel. It was shown to be the custom of the river for the master, before giving the order to let go, to inquire of the engineer as to the condition of the steam, and await his reply that the steam is ready before giving the order to let go. Upon being started, the steamer was carried by the current down the river, and over the falls, and, striking a pier, was badly damaged, in consequence of which she sank. It was held that the loss was not the consequence of the derangement of the mud-valve, and therefore not within the exception of the

policy, but that the proximate cause of the loss was a peril of the river, occasioned by negligence of the master in not ascertaining, before giving the signal to let the vessel go, that she had steam enough for her proper management. It is true that in delivering the opinion of the court Mr. Justice HARLAN uses language which would seem to indicate that, if the loss was occasioned by a peril of the river, it would make no difference that it was remotely caused by the negligence of the master; but the case did not call for this observation, as there was no exception in the policy of losses occasioned by the negligence of the master, and the law has ever been well settled in this country that for such negligence the underwriter, in the absence of any stipulation to the contrary, is liable. 1 Pars. Mar. Ins. 534, note; *Waters* v *Insurance Co.*, 11 Pet. 213; *Insurance Co.* v. *Webster*, 83 Ill. 470; *Insurance Co.* v. *Powell*, 13 B. Mon. 311; *Insurance Co.* v. *Transportation Co.*, 117 U. S. 325, 6 Sup. Ct. Rep. 750, 1176.

This case, however, is readily distinguishable from the one under consideration in the following particulars:

*First.* There was no exception in the policy of liability for losses occasioned by the negligence of the master or crew.

*Second.* Apparently the derangement or breakage of the machinery, for the consequences of which the company was not responsible, had been repaired.

*Third.* But it is clear the accident was not due to such derangement or breakage, but to the negligence of the master in giving the signal to start the boat before inquiring of the engineer whether there was sufficient steam. As this negligence was followed by the sinking of the vessel,—a peril of the sea,—for both of which the underwriter was responsible, there would seem to have been no doubt of the owner's right of recovery. Here, it will be noticed, there was a distinct intervening cause between the remote cause—the derangement of the machinery—and the loss, viz., the negligent act of the master in starting the boat.

A case nearer in point, and an instructive one upon the subject of proximate and remote cause, is that of *Dole* v. *Insurance Co.*, 2 Cliff. 394. In this case the policy was warranted free from capture, seizure, or detention. During the Rebellion, the ship was captured and burned by the commander of a rebel privateer, and it was insisted on behalf of the plaintiff that the fire, and not the capture, was the proximate cause of the loss; that the fire, not having been a means used in taking possession of the ship, but having occurred after the taking was complete, and after her assailants had obtained undisputed possession of her, was the efficient and sole cause of her loss. But the defense contended that the hostile act of the officers and crew of the privateer were the efficient and prevailing cause of the loss and destruction of the vessel, and that the taking and the burning were parts of one and the same act of hostility. Mr. Justice CLIFFORD took this view, and held that the capture was made for the purpose of destroying the vessel, and that the capture and burning were parts of the same act. The capture was held to be the efficient, predominating peril, for which the company was not liable, and judg-

ment was rendered for the defendant. The learned judge cites in support of his decision the case of *Waters* v. *Insurance Co.*, 11 Pet. 213, in which a vessel had been set on fire by the master and crew with a barratrous intent, and it was held that the loss was properly a loss attributable to the barratry, as its proximate cause, as it concurred as the efficient agent with the fire, when the injury was produced. It was said that if the master or crew should barratrously bore holes in the bottom of the vessel, and the latter should thereby be filled with water and sink, the loss would properly be deemed a loss by barratry, and not by a peril of the sea, although the flow of the water should co-operate in producing the sinking. It was also held in this case that any explosion of gunpowder caused by the fire should be deemed a loss by fire, and not by explosion.

The rule announced in the case of *The Portsmouth*, 9 Wall. 682, is consonant with these principles. This was an action for the loss of part of a cargo by a jettison resorted to in order to lighten the vessel after she had been run aground by the negligence of the master; and the question was whether the jettison was occasioned by the dangers of lake navigation, for which, under the bills of lading, the vessel was not liable. Mr. Justice STRONG in delivering the opinion, observed that—

"A loss by a jettison occasioned by a peril of the sea is, in ordinary cases, a loss by perils of the sea. But it is well settled that if a jettison of a cargo, or a part of it, is rendered necessary by any fault or breach of contract of the master or owners of the vessel, the jettison must be attributed to that fault or breach of contract, rather than to the sea peril, though that may also be present, and enter into the case. This is a principle alike applicable to the exceptions in bills of lading and in policies of insurance. Though the peril of the sea may be nearer in time to the disaster, the efficient cause, without which the peril would not have been incurred, is regarded as the proximate cause of the loss."

It will be observed here that the court expressly repudiates a distinction formerly taken between bills of lading and policies of insurance with regard to what shall be deemed a loss by a peril of the sea. This distinction has also been fully exploded by the house of lords in England in the recent cases of *Wilson* v. *Owners, etc.*, 6 Asp. 207, 12 App. Cas. 503, and *Hamilton* v. *Pandorf*, 6 Asp. 212, 12 App. Cas. 518, 525. Pertinent illustrations of this doctrine of proximate and remote causes are also contained in the opinion of Justice STORY in *Peters* v. *Insurance Co.*, 14 Pet. 99, 110. In this case the vessel had met with a collision in the River Elbe, and, upon being libeled in the admiralty court at Hamburg, was condemned to bear half the entire loss, although the court decreed that the collision was without fault on the part of either vessel. It was held that the underwriters were liable, under the peculiar law of Hamburg fixing the liability for half the loss, and that the collision was to be deemed the proximate cause of the loss. The doctrine of proximate and remote cause was admirably illustrated by Mr. Justice STORY in this case in his argument upon page 110. See, also, *Insurance Co.* v. *Sherwood*, 14 How. 351. The result of these cases seems to be that by

the proximate cause of loss is to be understood, not necessarily that cause which instantly precedes or accompanies the loss in point of time, but the dominant cause, the cause but for which the loss would not have occurred, and between which and the loss no other distinct cause intervened.

(2) Conceding, apparently, to some extent, the pertinence and force of these suggestions, the learned advocate for libelant insists that such distinct, intervening cause did exist in this case in the storm or threatened storm which is claimed to have created the necessity for the scuttling. The facts in this connection, putting them in the most favorable light for the libelant, are that the stranding, which occurred about half past 2 in the afternoon, produced no serious damage to the steamer. At this time the weather was pleasant, the sea smooth, and no immediate danger threatened the vessel or her cargo. After making some fruitless efforts to get her off, it appears that, some two or three hours after she stranded, the master sent one of his officers ashore for the purpose of telegraphing for a tug. Up to that time she had not pounded, nor was she considered in danger. About half past 5 o'clock in the afternoon, and some five or six hours after the stranding occurred, the wind changed from the north-west, and the sea began to rise; and about 11 o'clock in the evening it became necessary to scuttle the propeller to prevent her pounding on the boulders, and being driven further ashore. If this had not been done, the steamer would probably have been a total wreck, and the cargo lost; the wind changing from north-west to north, and blowing hard, with a heavy sea running. On Monday night the tugs and steam-pumps arrived, and operations were begun to get the steamer off. These were continued until Tuesday afternoon, when she was gotten off, and left for Sarnia in tow of the tugs.

The question is thus presented whether the storm which arose after the stranding must be deemed the proximate cause of the voluntary sacrifice of scuttling, and the subsequent expense of tugs, steam-pumps, and lighters to relieve the steamer. It certainly was not the occasion of the whole of this expense, since the steamer had made fruitless efforts to release herself, and the master had sent one of his officers ashore for the purpose of telegraphing for a tug, some hours before the storm arose. But, irrespective of this consideration, was the storm such a distinct, independent cause of loss as fire or a collision would have been, had it broken out or occurred while the steamer was aground, as renders the insurer liable? In my opinion it was not. To have this effect there must be not only a new agency productive of loss, but it must have been an agency disconnected with the previous peril, and one which could not reasonably have been anticipated as a consequence of it. Now, to say that a storm may not be expected to follow upon a stranding, by which the damage occasioned by the stranding may be increased, is to contradict the experience of every sailor upon the lakes. Indeed, the danger following upon a stranding, and the amount of salvage allowed in such cases for rescuing the vessel, is determined very largely by the situation of the vessel stranded. If she be in an exposed position, where a storm is

likely to do her additional injury, no court would hesitate to allow the expenses of salving her in general average, though the weather at the time were never so pleasant; while if the stranding takes place in protected waters, where a storm can do her no additional injury, the expense of getting her off is not regarded as a salvage claim, but as an ordinary incident of navigation, and chargeable to the vessel alone.  *The Alcona,* 9 Fed. Rep. 172.  Now, if it had not been for the original stranding in this case, there is no reason to believe that the storm, which was one of the most ordinary incidents of navigation, would have put the steamer in any peril whatever.  It was the stranding, and that alone, which made the storm an element of danger, and this was a cause which never ceased to operate until the loss was complete.  The sequence of events, from the original shock of striking the rock until the final relief of the vessel, is unbroken by a single incident that could not reasonably have been anticipated.  If the steamer had been released from this peril, and before arriving at her port of destination had encountered and been lost in a storm, that would undoubtedly have been deemed the proximate cause of the loss, though it were proved that, had she not been delayed by the stranding, she would have reached her destination before the storm arose. *Daniels* v. *Ballantine,* 23 Ohio St. 532; *Railroad Co.* v. *Reeves,* 10 Wall. 176; *Morrison* v. *Davis,* 20 Pa. St. 171; *Denny* v. *Railroad Co.,* 13 Gray, 481.  But where the storm occurs while the negligent act is still in full operation, and injury by such storm might reasonably be anticipated as a consequence of the negligence, the storm will not be deemed the dominant, efficient cause of the loss.

While there may be a few authorities, both in England and in this country, which lend some encouragement to the position assumed by the libelant here, the federal cases lean distinctly in the other direction.   In *Railroad Co.* v. *Kellogg,* 94 U. S. 469, which was an action to recover for the destruction by fire of plaintiff's saw-mill, the plaintiff alleged that the fire was negligently communicated from the defendants' steam-boat to an elevator built of pine lumber 120 feet high, owned by the defendants, and standing on the bank of the river, and from the elevator to plaintiff's saw-mill and lumber-pile, while an unusually strong wind was blowing from the elevator towards the mill and lumber.  The court submitted it to the jury to find whether the burning of the mill and lumber was a result naturally and reasonably to be expected from the burning of the elevator, under the circumstances, and whether it was the result of the continued influence and effect of the sparks from the boat without the aid or concurrence of other causes not reasonably to have been expected.  The instruction was held to be correct, and in delivering the opinion Mr. Justice STRONG observed:

"It is generally held that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances.  *  *  *   But when there is no intermediate efficient cause, the original wrong must be considered as reaching to

the effect, and proximate to it. The inquiry must therefore always be whether there was any intermediate cause, disconnected from the primary fault, and self-operating, which produced the injury."

In *Insurance Co.* v. *Boon*, 95 U. S. 117, a policy of fire insurance exempted the company from liability for any loss or damage by fire which might happen by means of any invasion, insurrection, riot, or civil commotion, or of any military or usurped power. An armed force of rebels, under military organization, surrounded and attacked the city in which the property was located. Finding the city could not be successfully defended, the federal officer in command, in order to prevent the military stores deposited in the city hall from falling into the possession of the rebel forces, set fire to the hall. Without other interference or agency the fire spread to the building next adjacent to the city hall, and through two intermediate buildings to the store containing the goods insured, and destroyed them. It was held that the fire was excepted from the risk undertaken by the insurers, upon the ground that the burning of the city hall and the spreading of the fire afterwards was not a new and independent cause of the loss. On the contrary, it was an incident—a necessary incident—and consequence of the hostile rebel attack on the town,—a military necessity caused by the attack. It was one of a continuous chain of events brought into being by the usurped military power,—events so linked together as to form one continuous whole. The case of *Brown* v. *Insurance Co.*, 61 N. Y. 332, is much like the present. A policy of insurance upon the cargo of a canal-boat provided the policy should cease if the boat was "prevented or detained by ice, or the closing of navigation, from terminating the trip;" and it was held that where the canal-boat had been driven ashore and stranded, and ice had subsequently formed around it during the night, so that it could not be reached, and was subsequently broken in two by the ice, and the cargo injured, that the predominating efficient cause of the loss was the storm, and not the ice, and that the company was liable. The court observed:

"The detention caused by her being driven out of her course was due, beyond all question, to the gale. Her detention on the shore until the ice formed around her was due to a consequence of the gale,—stranding. Did that cause cease to operate because ice formed in front of the boat, and between her and the channel? Is it not rather the true view that the presence of the ice prevented the removal of the cause which created detention, and was slowly working the destruction of the cargo?"

That a storm is not to be regarded as an unexpected incident, or one which a prudent man should not anticipate, either upon land or water, was held in the case of *Poeppers* v. *Railway Co.*, 67 Mo. 715, and in *Derry* v. *Flitner*, 118 Mass. 134. It was said in these cases that the rise of the wind could not be regarded as the intervention of a new agency, so as to relieve the defendant from the consequences of previous negligence.

Upon the whole, it seems to me that the storm in this case, which was not one of unusual violence, was such a consequence of the stranding as might have been reasonably anticipated, and ought not to be considered as a distinct, independent cause of the voluntary scuttling. Bearing in

mind the very broad exemption of this policy "of all perils, losses, and expenses arising from or consequent upon negligence," and that jettison or voluntary scuttling is not a distinct peril or loss of itself, but is such only when covered by a peril insured against, I find it impossible to avoid the conclusion that the loss in this case was within the exception of this policy, and that the libel should be dismissed.