## VAN DEN TOORN v. LEEMING et al.

(District Court, S. D. New York. October 24, 1895.)

GENERAL AVERAGE — BROKEN SHAFT — REPAIR — SUBSEQUENT BREAKDOWN DAMAGING VESSEL NOT A VOLUNTARY SACRIFICE—NO GENERAL AVERAGE— ABNORMAL USE.

A crack being found in the crank shaft of the steamship Schiedam, on a voyage to New York, when about 316 miles east of Sandy Hook, the shaft was repaired by bolts, and the vessel resumed her voyage at three-fourths of full speed. Thirty-eight and one-half hours afterwards, when within about 16 miles of Sandy Hook, the shaft broke off suddenly, and damaged the machinery to the amount of about $13,000. She was towed the rest of the way to quarantine, for which a salvage compensation of

$1,000 was allowed. In a general average adjustment, the $13,000 damages from the breakdown was allowed, and the above suit brought against the defendants as cargo owners for their proportion. The bill of lading excepted "consequences of defects in the machinery." The master and chief engineer testified that in determining to proceed under repair, they considered the liability to breakdown and damage therefrom; but concluded to proceed in order to avoid a large salvage award for towage, and because, as the engineer said, "he knew that he could make the repairs, and that it could do the work." Neither the entry in the log, nor the protest at the end of the voyage showed any intent to make a general average sacrifice. *Held*: (1) That as the crack was first found after heavy weather, and in the absence of any issue as to the ship's seaworthiness, her sufficiency on sailing should be assumed; (2) that the evidence was insufficient to show any intent to make a general average sacrifice, but indicated only the exercise of the ordinary duty of repair, and the continuance of the voyage under such conditions of the machinery as were believed to be sufficient for the voyage, though the possibility of damage was recognized; (3) that this was not sufficient to constitute a general average act of sacrifice, and that in continuing the voyage in favorable weather under such conditions, the question of "abnormal use" of the ship's machinery did not arise; and that damages arising from the breakdown should be excluded from the general average.

This was a libel by William H. Van den Toorn against Thomas Leeming and others to enforce payment of a general average contribution from defendants as consignees of certain cargo shipped on board the steamship Schiedam.

Wing, Shoudy & Putnam, for libelant.
Hand & Bonney, for respondents.

BROWN, District Judge. The above libel was filed to enforce the payment of a general average contribution against one of the consignees of cargo on board the steamship Schiedam, which arrived in this port from Rotterdam on July 14, 1891. When 316 miles to the eastward of Sandy Hook, on the evening of July 10th, between half past 7 and 8 o'clock, a crack 18 inches long was discovered on one side of the main shaft, mostly inside of the after bearing, and about 2 feet from the crank. This was temporarily repaired during the 24 hours following by drilling the shaft, which was $14\frac{1}{2}$ inches in diameter, and inserting two iron bolts 11 inches long and $1\frac{3}{8}$ in diameter, across the line of the crack. The ship then proceeded on her voyage at about three-fourths of full speed (making 37 or 38 revolutions per minute instead of 50 to 52, full speed) without interruption for $38\frac{1}{2}$ hours to within about 16 miles of Sandy Hook, when, after having thus made about 300 miles, the shaft suddenly broke wholly off at about 10 a. m. of July 13th, at the original place of fracture. The fractured parts, riding each other, carried away the bearings, damaged the bed plate and channel way, and did much other injury to the machinery. At about 2 p. m. of the same day, the ship was taken in tow by a tug, and reached quarantine at Staten Island at 9 p. m. For this latter towage service, $1,000 was allowed as salvage compensation. The Schiedam, 48 Fed. 923.

A general average account was afterwards adjusted, amounting in all to $17,508.65. In this charge was included not only the ex-

pense of the towage last named, with other items concerning which there is but slight difference, but also charges to the amount of about $13,000 on account of the damage done to the vessel and machinery by the last violent breakdown of the shaft. No charge was made for the cracked shaft itself, nor for any injury supposed to have been done to the bearings before the repair to the shaft was made.

If the crack found on July 11th arose through any unfitness of the crank shaft at the time of sailing, that would constitute unseaworthiness of the ship in that regard, and any claim of general average would be excluded through this fault of the ship (1 Pars. Shipp. & Adm. 383; The Ontario, 37 Fed. 220; Strang v. Scott, 14 App. Cas. 601, 608), unless the exceptions in the bill of lading excuse the ship from the consequences of this defect. In the case of The Laertes, 12 Prob. Div. 187, the bill of lading excepted "any liability for loss or damage through latent defects in the machinery," and the general average claim was allowed. In the present case the bill of lading excepts the "consequences of defects in the machinery," nothing being expressly said concerning latent defects at the time of sailing. In The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, it was held by a majority of the court that an exception of "loss or damage from steam boilers and machinery or defects therein" (the word "latent" not being used) did not excuse the ship for damage arising from the breaking of the crank shaft through a latent defect existing at the commencement of the voyage.

The decision of the supreme court in that case would be controlling, if it were ascertained that the breaking of the crank shaft in this case arose from defects existing at the beginning of the voyage. No direct issue, however, has been made on that point, and the evidence is comparatively meager. The extracts from the log show that during several days from June 27th to June 30th, the ship met heavy weather, "terrible, high, confused sea"; "the vessel rolling and pitching, terrible heavy, and laboring difficult; strong racing engine; shipped continually heavy head seas." Some damage was done to the ship, and some articles were carried away. On the 30th the steamer was stopped for an hour on account of some work to be done to the engine. Ten days afterwards the log notes "fresh breeze, high, confused sea, the vessel pitching and rolling very heavily, shipped much water over the foreship." On the evening of the following day, July 11th, the crack in the engine was discovered.

The long interval that elapsed after the very heavy weather and the racing of the engine, ending on June 30th, and the little bad weather afterwards, throws some uncertainty on the question whether the crack in the shaft arose from the effects of the previous heavy weather upon a sound shaft, or whether the shaft was unsound at the time of sailing. In the absence, however, of any specific issue upon this point, it should, perhaps, be assumed here that the break did not arise from any defect or weakness at the time when the ship sailed.

The ground upon which a general average is claimed for the damage arising from the break is, that it was an extraordinary expense,

and a sacrifice voluntarily incurred by the ship through the endeavor to make port by a repair for the benefit of all, and in lieu of a large salvage claim which would otherwise have been necessarily incurred for towage some 300 miles, and which would have been a general average charge; that the danger of the violent break, and of the consequent injury to the vessel, was foreseen; that this danger was such that it was not the duty of the ship as carrier to incur it at her own risk; and that as the risk was taken with deliberation, and in the exercise of a reasonable judgment by the master in choosing different modes to extricate the ship from her helpless condition, the consequences of the break, while going on under repair, were, in effect, a voluntary sacrifice by the ship, entitling her to be compensated on the principles of general average by all the interests benefited; and that although the service rendered by this sacrifice was not completely successful, it nevertheless brought the ship so nearly into port as very greatly to reduce the final salvage incurred.

For the defense it is contended that the circumstances are not sufficient to bring the case within any acknowledged rules of general average; and no adjudication has been brought to the attention of the court in any strictly analogous case.

As regards expenses sought to be recovered by general average, "it is quite certain," says Parsons (1 Shipp. & Adm. 381) "that there must be here, as elsewhere, a sacrifice which is voluntary, necessary, and effectual."

Was this damage a sacrifice of that character? To support the voluntary nature of this loss, the libelant cites particularly the case of The Star of Hope, 9 Wall. 203, where the master of the ship, which had a fire in the hold, was compelled in order to avoid speedy destruction, to enter an unknown and uninhabited harbor, in doing which the vessel stranded. The vessel there took in water enough to put out the fire; then she was got off, went to a port of repair, and subsequently reached her destination; and it was held that the damage arising from the stranding and the subsequent necessary repairs were general average. The certainty of danger, and the contemplation and expectation of stranding by the master, being sufficient evidence that the will of man contributed to the stranding sufficiently to make the stranding voluntary, within the requirements of general average. That the sacrifice was necessary, and saved ship and cargo, was not disputed.

So here it is claimed that proceeding with the imperfectly repaired shaft was deliberately done in full contemplation of the liability to the damage that subsequently occurred. There are marked differences, however, between the two cases. In The Star of Hope, the stranding was not only contemplated and expected, as in all the other cases of voluntary stranding in which a general average has been allowed, but it was itself the means of safety; while here the subsequent breaking down of the machinery was not expected; was of no benefit to ship or cargo, but interrupted all further use of the machinery, and left the ship still in need of salvage service, though to a less extent than at first. In the former case also, the ship departed from her course, and from her ordinary navigation, and en-

tered upon an expected act of sacrifice, which was of itself a general average act. In the present case, the ship pursued her usual course, and used her machinery, though weakened by the crack, in the ordinary course of navigation alone, and in favorable weather, in the hope and expectation of accomplishing her voyage without any such breakdown; though the possible liability to special damage was recognized; and neither the act of repairing the shaft, nor the act of going on under repair, were in themselves general average acts of sacrifice, or so intended.

The evidence going to show an expected sacrifice on the part of the ship, or an expectation of such damage as actually happened, is not as strong, or as convincing as is stated in the libelant's argument. The evidence hardly shows more than the recognition of a possibility of injury; but with a confident expectation that any breakdown would be avoided. If this be the fair inference from the testimony, the case would not be one of an intentional sacrifice; but only of disappointment in the hope of avoiding a possible danger. The evidence of the master on this point is as follows:

"Q. Did you consider whether or not to take a tow or to be towed by another steamship? A. We considered that we might be taken in tow, so far as we had taken in consideration that we might temporarily repair the break.

"Q. Was anything said by you or by the engineers at the time as to any danger of attempting to proceed with the engines after the break had been temporarily repaired? A. Yes.

"Q. What dangers were considered or spoken of? A. That in consequence of the break the engines would work eccentrically and most decidedly injure the blocks.

"Q. Was there any risk also considered as to the possibility of a breakdown after they had started? A. Yes; the possibility of the crank breaking was considered; the probability being that if that part of the machinery breaks there is probability of more parts of the machinery breaking.

"Q. Why did you conclude to proceed with this vessel with your machinery repaired and take the dangers that you have spoken of, instead of letting your vessel in by some west-bound steamer? A. I thought it was a very good reason for me to assume to go ahead with my machinery repaired, so as to avoid the very heavy salvage which would be incurred."

Chief engineer:

"Q. What, if any, risk or danger was there in attempting to go ahead with the ship having the shaft repaired as you did it? A. There was a chance that it might hold; we took the chances of economizing towage. The chances were that only the bolts might break, or that the break which did occur might take place."

"Q. Was there any risk of the machinery working irregularly by being repaired in this way? A. No, there was a danger that an edge might declare itself where the break was repaired which might injure the metal around."

"Q. Why was it that you decided to make these unusual repairs and take these risks of proceeding under your own steam, instead of taking a tow? A. In the first place, I knew that I could make the repairs, and that it could do the work; as was evidenced by its going 300 miles. And in the second place, it was for the purpose of saving the expense of being towed."

"Q. At the time that you decided to go ahead under your own steam, did you consider that further damage might result from the working of the machinery or from the second breakdown? A. Yes."

Mr. Martin, an expert naval architect and engineer, who carefully examined the machinery after the steamer's arrival in New York, and indicated to the adjusters the proper separation in the items of

the repair bill as between the general average, and the particular average charges testified, that the cross-sectional area of the shaft as compared with the cross-sectional area of the two bolts, was but 5 per cent.

"Q. Therefore the chances of the shaft's standing the normal strain of propulsion would be only about 5 per cent.? A. That is all. Very small.

"Q. Then that risk must be apparent to any engineer, must it not? A. Undoubtedly, any engineer that knew anything about the strength of materials would know that it was a foregone conclusion that that thing would give out sooner or later. It might possibly last for a short time and it might give out very suddenly."

"Q. Then the risk of a somewhat disastrous breakdown would be there all the time while it was going? A. Yes, sir."

"Q. It is possible that she might have run across the ocean in that way, isn't it? A. I suppose it might. You can't tell what will happen. But it is very doubtful. It is extremely so for the reason that the longer they worked the engine with the shaft repaired in the way it was, the greater the strain was becoming on those bolts; it was opening the fracture in the shaft all the time; and as soon as that opened to a certain point, it was bound to shear off those bolts.

"Q. This method of repair I think you have already said was really the only practicable one they could have adopted? A. The only thing they could have done with that shaft."

The engineer also testified that during the first six hours after the engine was started it "ran as regularly as it always had"; but after that, "it began to work more eccentrically; and possibly also there was more movement on account of the working of the metal, and possibly also in the movement of the crank." He also says that at first "when the shaft turned you could see a crack in which you could put the point of a pencil; but when it did not turn, it closed itself up again."

From this testimony, which is all that there is on the subject, the fair inference seems to me to be that the judgment of the master, and of the engineer, was, that they could make New York without any further breakdown in the machinery, and that they expected to do so; although they recognized the possibility of special damage in case the crank should part suddenly while the engine was in motion. Mr. Martin's testimony as to the comparative area of the cross-section of the bolts and of the shaft, does not represent the comparative strength of the shaft when repaired; because the crack at the time of repair did not extend entirely through the shaft, but was only upon one side of it. The shaft, when the crack was first discovered, was working at full speed, and the shaft evidently, therefore, had still great strength, and the crack closed up when the shaft was still. There was but a partial break; and when repaired, there remained for service the strength of so much of the shaft as was unbroken, as well as the strength of the bolts in addition.

There are no entries in the log, or in the ship's protest on arrival, that indicate any idea of a voluntary sacrifice or expectation of incurring any extraordinary danger, or expense, at the time when the repair of the shaft was made and the voyage resumed. The language of the protest is as follows:

"July 11, 1891. On examination the crack in the crank shaft proved to be eighteen (18) English inches long, resolved to make two steel tapping bolts

in it, in order to proceed on our voyage, showed our flag & signal to the S. S. Olympia coursing in a westerly direction and belonging to the Anchor Line; considered if it would be advisable to ask for assistance but concluded that in order to save costs of salvage assistance, we should try to repair the crack in the shaft, as good as possible and to steam according to circumstances to New York. We could only lose thereby the clutch in which the cracked end of the shaft rested and the other shafts which would suffer on account of the irregular working of the broken crank shaft. The weather and the season being favorable, we could by remaining in the route of the steamships, get speedily, assistance if necessary, so we did not ask any assistance, but requested to be reported."

From this it seems evident that no damage from breakdown was contemplated as probable. It is stated as an ordinary case of an attempt to repair a broken shaft, and to work the ship according to circumstances, taking assistance later, if found necessary.

That it was expected to make port without any further breakdown, must further be inferred, not only from the engineer's direct statement: "I knew that I could make the repairs, and that it could do the work"; but also from the further circumstance that on completion of the repairs the ship was put at quite three-fourths of her full speed (10 knots), making about 300 miles in the following 38½ hours; and that during those 38½ hours, up to the time of the sudden and final breakdown, there was no careful examination made of the condition of the shaft. Such an examination, though inconvenient, because the break was inside of the bearings, was evidently as practicable as was the examination of the original crack, and the making of the repairs. Had any sudden breakdown been really anticipated, or any such damage therefrom as occurred, I cannot conceive that an examination of the shaft would not have been made from time to time, in order to avert such extensive injuries. The fact that after the first six hours the crank ran less regularly than before, indicated increasing disorder. Any reasonable examination during those 38½ hours must have shown deeper fracture and increasing weakness, and have suggested, therefore, the necessity of some further abatement of the speed at which the engine was worked, had any sudden breakdown been anticipated.

Aside from the other questions which the above considerations suggest concerning the prudent management and care of the weakened shaft while thus used, the necessary inference is that the master and engineer neither intended nor expected the breakdown, or the injuries caused by it; and that they proceeded under repair in order to avoid paying a salvage award for towage, and because they believed the ship could make port by her own steam, going at three-fourths of her full speed, without any further material injury. Damages arising under such circumstances I cannot regard as being in any proper sense a voluntary sacrifice, within the requirements of general average, any more than the damages which might have arisen from the master's determination to continue the voyage without repairing the shaft at all, in case the engineers thought the shaft might hold out long enough to reach port. In both cases alike, as it seems to me, there is no ground for a general average claim, because no sacrifice nor any extraordinary expense or risk was in-

tended; but only the continuance of the voyage under such conditions of the machinery when repaired, as the master and officers deemed adequate.

It is the duty of the master, as a part of the contract of carriage, to keep the machinery in adequate working condition, so far as is practicable by the customary methods of repair; and when repairs judged to be sufficient have been made, apparently in the performance of this duty, and the ship pursues the ordinary course of her voyage, and no contemporaneous evidence from the log, or from the protest at the close of the voyage, indicates any intention, at the time the acts were done, to make a general average sacrifice, I do not think that character should be attributed to such acts afterwards, so as to make the damage from a subsequent unanticipated breakdown a general average charge. Gourl. Gen. Av. 14, 15; Lown. Gen. Av. 35, 36.

If the above view of the facts is correct, it is sufficient for the decision of the present case, without considering the libelant's arguments concerning the alleged "abnormal use" of the ship's machinery. See Lown. Gen. Av. (4th Ed.) p. 115; The Bona [1895] Prob. 125. For if the acts of repair were done without any view to a voluntary sacrifice, and only in the exercise of the ordinary right and duty to repair, and were such as were deemed sufficient by the master and the officers, and the ship thereupon pursued her ordinary course of navigation, I do not see how any question of "abnormal use" can in this case arise.

The damages arising from the final break of the shaft should, therefore, be excluded from the general average, and the libelant's recovery limited to what shall appear to be due upon a new adjustment, excluding the damages last stated and whatever is merely incidental thereto. If the parties do not agree, a reference may be taken to adjust the same.