TRINIDAD SHIPPING & TRADING CO. v. FRAME, ALSTON & CO. et al.

(District Court, S. D. New York. February 23, 1898.)

GENERAL AVERAGE—STRANDING—FAILURE TO SUPPLY PROPER CHARTS.

The steamship I. stranded on Nevis Island far outside of the direct course to New York, and the line of the sailing directions. She was not fully supplied with proper charts, and was directed by the owners to skirt the Windward Islands for the entertainment of passengers. *Held*, that the owners were responsible for the lack of charts and for the risks of the course they directed, and could not claim general average against the cargo for the expenses caused by the stranding.

This was a libel in personam by the Trinidad Shipping & Trading Company against Frame, Alston & Co. and the Marine Insurance Company to enforce a claim for general average.

Cowen, Wing, Putnam & Burlingham, for libelants.
Butler, Notman, Joline & Mynderse, for respondents.

BROWN, District Judge. In the afternoon of March 23, 1896, in clear, calm weather, the Irrawaddy, an iron steamship 350 feet long, 1,697 tons net register and drawing 21½ feet, while on a voyage from Granada to New York, with general cargo and about 20 passengers, struck on a coral reef near the southwestern part of Nevis Island, one of the Windward Isles. In about 10 days, and after removing part of the cargo, she was pumped out and hauled off, towed into St. Kitts, and repaired sufficiently to complete her voyage to New York. A general average statement was then made up, in which the respondents as cargo owners were charged with $3,459.93. Of this sum $1,594.93 was on account of the loss and damage to the shipowners, the residue was for the damage to cargo. The respondents paid the amount assessed on account of the cargo, but refused to pay the amount assessed in respect to the alleged sacrifices of the shipowners, on the ground that the accident arose through the improper and negligent navigation of the ship too close to Nevis Island under instructions from the libelants, and also because the ship was not equipped with sufficient charts and sailing directions for navigation in those waters, nor was the master acquainted therewith. The libel was filed to recover the balance of the general average assessment.

The place of the stranding is approximately fixed by the testimony of the master of the Irrawaddy, who states that the southern extremity of Nevis bore from the ship E. ⅜ S. The ship was stranded upon two ridges of rock rising about 6 feet from the bottom running about E. and W., 30 feet apart, and each about 12 feet wide and about 60 feet long. While the ship lay stranded the master took soundings and found five or six fathoms of water for a considerable distance around. The distance to the shore was not measured, but was estimated at about three-quarters of a mile. The master had not previously been in these waters.

The vessel was one of a line, known as the Christall Line, running between New York and the Windward Isles. She had taken on cargo at Trinidad, proceeded to Granada where she completed her loading, and left Granada bound for New York without further stop. In the direct course of such a voyage, she would not naturally approach Nevis within 10 or 15 miles in following the sailing directions, or the special charts of that region. The superintendent of the line, however, had given instructions, and it was common practice for vessels, to go much nearer to the islands along the route, for the entertainment of the passengers, and the line was advertised to run in this way. A few minutes before the ship struck, the captain had consulted his blue print chart, which he testifies was the only chart supplied to him. This chart was upon a small scale, and gave no indication of reefs or shoals. The enlarged special charts of the Windward Isles indicate the proper course to New York, and refer to reefs and shoals

along the west side of these Islands which are to be avoided. The printed sailing directions supplied to the master do state that "the south coast of Nevis should not be approached nearer than a depth of 12 fathoms." The island is of volcanic origin, and coral reefs are known to skirt its borders. The master states that the reefs on which he ran were known to fishermen. He himself was not familiar with the waters; but was told of the usage to run within one-half a mile of the shore, and from evidence on the libelants' part, it appears that other masters were accustomed at times to go near the shore for its interest to passengers.

There is some evidence tending to show that a copy of the enlarged map was on board the Irrawaddy, brought on board by the previous master, Capt. Legg. His testimony on this point, however, is not positive; and the explicit statement of Capt. McMillan, that he had no other chart than the blue print should, I think, be accepted as correct. The enlarged chart shows an irregular contour line about the southwest portion of Nevis with an elbow-like projection marked on the chart $3\frac{1}{4}$ fathoms within 1,000 feet of the very spot marked by Capt. McMillan as the place where he stranded. Upon so small a difference as that, in the absence of exact measurement of the reef from shore, I am by no means certain that the reefs on which the vessel struck are not designed to be marked by the projection of the three fathom contour line above referred to. Had such a map been before the master, showing such an irregular contour line, of $3\frac{1}{4}$ fathoms at this point, which was $3\frac{1}{2}$ feet less than his draft, it is scarcely conceivable that a prudent master, even under general instructions to give passengers a view of the shore of Nevis, would have ventured so near as within 1,000 feet of this projecting point. The absence of the enlarged chart, which the respondents' testimony shows ought to be in the hands of every navigator in those waters, I must therefore regard as directly contributing to the accident; and that for the want of it the libelants are responsible.

Aside from this, I am of the opinion that the instructions of the company to pursue navigation so widely deviating from the safe routes and so near to islands skirted with coral reefs, involves them in responsibility such as to exclude them from making general average charges for their own indemnity. The positive sailing directions that the south coast should not be approached nearer than a depth of 12 fathoms, as well as the chart referring to the shoals, clearly points out the path of safety, and the danger of a near approach to these islands, and it should have been observed by all concerned, in the absence of thorough soundings, and of maps precisely locating the places of all reefs. The testimony on the part of the libelants seems to me wholly insufficient to establish the reasonable safety of the course taken, or to make it consistent with prudent navigation such as can rightfully charge cargo owners with the risks attending it, as risks properly belonging to the class of sea perils or dangers of the sea.

For these reasons I must hold the respondents discharged of any obligation to pay a general average assessment merely as indemnity to the owners for their own losses. In the recent case of Chrystall v. Flint, 82 Fed. 472, it was held that where, under the provisions of

the Harter act, the owner is exempted from responsibility for a negligent stranding, he might recover in general average for his own indemnity. This was upon the ground that in such cases the faults of navigation are no longer imputed by law to the owner as his own faults. The case has no application where the owners have failed to supply the master with proper charts for the voyage, or where by particular instructions they have contributed to the imprudent navigation that led to the disaster. In such cases the owners are themselves in fault, and under the general rule are, therefore, precluded from having a general average charge for their own indemnity. The Ontario, 37 Fed. 222; Van den Toorn v. Leeming, 70 Fed. 251.

The libel is therefore dismissed with costs.