THE NATHAN HALE.

(District Court, S. D. New York. December 12, 1898.)

TOWAGE — STRANDING — UNKNOWN ROCK — QUICK'S HOLE — DEVIATION FROM USUAL COURSE.
It is the duty of a tug to take her tow by the usual channel course; the tug N. H. in passing through Quick's Hole, having gone considerably to the westward of the usual course and deviated from the sailing directions, and thereby ran her tow upon a rock previously unknown to navigators, held, that the tug was liable.

In Admiralty.

Robinson, Biddle & Ward, for libelant
Carpenter & Park, for claimant.

BROWN, District Judge. The above libel was filed to recover the damages to the libelant's barge Felix, drawing 22 feet of water and loaded with 2,200 tons of coal, which was in tow of the steam tug Nathan Hale, and which at about 8:45 in the morning of August 22, 1897, was run upon some rocks in passing through Quick's Hole, going southward from Buzzard's Bay into Vineyard Sound. The passage is about one and one-half miles long by five-eighths or three-fourths of a mile wide. The libel charges that the barge was towed carelessly

and negligently in not keeping in the channel, or in sufficient water for her draft, as well as in taking the passage through Quick's Hole instead of going outside. The answer denies negligence and avers that the Felix was towed in the customary manner through the passage and in the middle of the channel, and that that passage was the natural and customary course for large steam tugs and coal barges engaged in the coal traffic.

The weight of evidence shows very clearly that Quick's Hole has for many years past been the usual and customary passage for coal barges and other vessels up to a draft of 24 feet, so that no fault can be ascribed to the tug in taking this course. I am equally satisfied upon the evidence that the barge did not strike the 21-foot rock in the southerly and westerly part of the passage, but some rock or rocks on the easterly edge of a shoal about 1,500 feet distant northwesterly from red buoy No. 2. Her bottom was thereby cut through in two places so that she soon sank. The rocks upon this shoal, though known to a few fishermen, were not generally known to navigators. No indication of them appears in the soundings noted in the large government charts of that passage. After the trial of this suit was commenced, a government survey was had in consequence of the testimony in this case as to the existence and location of these rocks. The survey confirms the testimony, and a plot of the survey has been submitted with the soundings. This shows the existence of a shoal, as above stated, which is irregular in outline, and renders unsafe and dangerous any navigation at low water with boats of over 18 feet draft for a distance of one-fourth of a mile to the eastward of the northerly one-third of Nashaweena Island.

Notwithstanding the fact that the existence of these rocks was not generally known, nor indicated on the chart, I am constrained to find the tug in this case answerable for the damage, on the ground that the barge could not have struck these rocks except by a substantial departure from the well-known and customary course, by going considerably to the westward of the middle of the passage instead of keeping to the middle, or to the easterly side of the middle, as is required by the sailing directions for this region, as well as by all the testimony of the many pilots examined in the case. The defendant's pilot indeed, testifies that he did pursue this course; but I am satisfied that this cannot possibly be correct. He testifies to what he ought to have done, and perhaps meant to do, but which it seems to me certain that he did not do. The sailing directions are explicit that the passage should be approached about in the middle, and that vessels should pass from 100 yards to 250 yards to the westward of the red buoy No. 2, situated about midway up the passage and about one-fourth of a mile to the westward of Pasque Island. The course given from abreast of buoy No. 2 to about 400 yards east of Lone Rock, a mile to the northward, is N. ⅜ E. if passing 250 yards to the westward of buoy No. 2, the extreme westerly limit indicated; or N. ¼ E., if passing but 100 yards to the westward of the buoy. The bearing of Gay Head light to the southward, is also given in the sailing directions, as well as that of Lone Rock; so that by observing and conforming to these courses and bearings, it would be impossible for a vessel to go

materially out of the proper course so as to bring her tow upon this ledge. Though the tide sets strongly through the passage, its course is true, and it constitutes no embarrassment, therefore, in clear weather. There were no circumstances to require or justify a departure from the usual course.

The courses required by the sailing directions and the expert testimony would carry vessels from 250 to 300 yards to the westward of the most easterly extremity of the shoal above referred to. If when abreast of buoy No. 2 the tug and tow were but 200 yards west of it, which is probably incorrect, they must have entered the passage far to the westward of the usual course, or it would have been impossible to graze the ledge.

The use of this passage by barges and other vessels of a draft equal to that of the Felix, as shown by the testimony and the Atlantic coast pilot, has been frequent for many years past. No previous disaster of this kind, however, has been reported. From the character of the shoal and the great number of rocks upon it that are less than 22 feet below low water, as shown in the recent survey, it is manifest that it is impossible that previous similar disasters should not have occurred, except for a uniform practice to keep further to the eastward than this tug ran; since it is impossible that any vessel of 22 feet draft could have gone either over this shoal or to the westward of it at low water. The shoal extends about 500 feet in a northwesterly direction from its easterly edge, which as above stated is about 1,500 feet northwest of buoy No. 2. It contains one rock only 17.2 feet below low water and upwards of 26 others less than 22 feet, and mostly less than 21 feet, below low-water mark. To the west of this shoal is a narrow passage about 150 feet only in width, beyond which all the way to the shore of Nashaweena Island the bottom is thickly interspersed with rocks from 20 to 17 feet only below low water. Thus the entire one-third part of the passage on its westerly side was impassable for such vessels. The situation is wholly different, therefore, from that of Pilgrim Rock in the East river,—a single, sharp, narrow, and isolated point.

Although a tug owes only the duty of reasonable care and nautical skill, and is not liable to her tow as an insurer, she is bound, nevertheless, in the exercise of reasonable prudence in navigation, to follow the usual and customary channels, and to observe the recognized authorities as respects sailing directions; she cannot depart therefrom unnecessarily except at her own risk. It is not just that the risk of such unnecessary departures should be thrown upon her tow. The Mascot, 48 Fed. 917, affirmed 6 C. C. A. 465, 57 Fed. 512; The S. W. Morris, 59 Fed. 616; and cases there cited; The Hercules, 81 Fed. 218; The Brazos, 14 Blatchf. 446; Trinidad Shipping & Trading Co. v. Frame, Alston & Co., 88 Fed. 528, 530.

In the recent case of The Belle, 89 Fed. 879, that tug was excused from liability upon special grounds only, namely; that by various excavations by the government and private parties, the channel had been considerably widened within a few years previous to the disaster and the course of navigation considerably changed, the old route being largely obstructed by vessels moored at Morris Dock and forcing

traffic to the westward. No such special circumstances here exist. Though this precise ledge was not known, the rocky nature of the shore, with rocks or shoals for a considerable distance from the eastern shore of Nashaweena Island, was well known and is indicated upon the chart itself. These facts with the general custom and the precise sailing directions afford abundant warning to keep away from the western one-third of the passage and near to the middle, where up to this time all vessels had previously gone and with safety.

Decree for the libelant with costs.