**IDEAL CEMENT COMPANY,**
**Libelant,**
v.
**THE Tug TICKFAW and THE Tug**
**WALKER NO. 9.**
**No. 533.**

United States District Court
E. D. Louisiana, Baton Rouge Division.
Sept. 7, 1956.

Deutsch, Kerrigan & Stiles, New Orleans, La., for libelant.

Charles Kohlmeyer, Jr., Lemle & Kelleher, Leon Sarpy, Chaffe, McCall, Phillips, Burke & Hopkins, New Orleans, La., for claimant.

BENJAMIN C. DAWKINS, Sr., District Judge.

February 20, 1954 this libel was filed against the two tugs above named for damages, allegedly done to the barge Ideal Cement No. 7 through negligence [1] of the captains and crews of the tugs in towing said barge from Baton Rouge to Newellton, Louisiana by way of the Mississippi River.

Some six months later August 27, 1954 Baton Rouge Coal & Towing Company, as the owner of the tugs, filed its petition under the 56th Rule in Admiralty, 28 U.S.C.A. impleading T. L. James & Company, setting forth the contract relations [2] between them, but denying negligence and liability. It admitted it had towed the barge under said agreement with James & Company and prayed that the demand be rejected but if claimant were held liable it have a decree over and against James & Company. On the same day (August 27, 1954), claimant answered the libel, denying generally and specially the charge of negligence, but admitting the Tug Walker No. 9 "came to fetch the barge" in question from Baton Rouge to Burn Landing on Lake Palmyra near Newellton, Louisiana; and that the "flotilla" was made up for pushing. It further admitted the barge had stranded and described the circumstances.[3]

September 10, 1954 libelant answered the interpleader denying authority of James & Company to make any agreement that the barge Ideal Cement No. 7 should be towed at owner's risk.

June 14, 1955 James & Company answered admitting claimant undertook *"the towage of the barge * * * pur-suant to an arrangement between Re-*

1. "(a) At a time and place and on a date unknown to libelant, but within the knowledge of the owners, operators and/or personnel of the Tug Tickfaw and/or Tug Walker No. 9, the Barge Ideal Cement #7 was towed and maneuvered in so negligent and careless a manner as to cause her to collide with, strike, strand or ground upon, or otherwise to come into contact with, a reef, rock, sandbar, wreck, or other object or structure, floating or submerged, thereby doing extensive damage to the bottom plating of said barge in the way of the centerline, causing said plating to be torn and buckled for a distance of approximately 80 feet beginning at a point approximately 9 feet forward of the forward rake bulkhead."

2. "The towage of the Barge Ideal Cement #7 was undertaken by petitioner pursuant to an agreement between *T. L. James & Company and petitioner whereby the towage was to be performed at owner's risk, petitioner assuming no liability for risks of negligence or otherwise.* T. L. James & Company in contracting with petitioner for such towage represented itself to be the owner or owner *pro hac vice* of the barge Ideal Cement #7. In the alternative, petitioner avers that T. L. James & Company was at the time acting as the agent of the owner of the said barge."

3. "At approximately 5:30 P.M. on September 17, 1953 the Tug Walker No. 9 with the Barge Ideal Cement #7 made up ahead departed Baton Rouge, Louisiana and headed up the Mississippi River for Newellton, Louisiana. The voyage proceeded without incident until the flotilla reached the vicinity of Mile 308.6 A.H.P. in the Mississippi River on September 18, 1953. At this time the *tow* was being navigated on the east side of the river in accordance with a standard practice and the dictates of good seamanship. On reaching Mile 308.6 A.H.P. the barge Ideal Cement #7 suddenly struck an uncharted and unknown submerged object. The Walker No. 9 immediately began efforts to free the barge, which were soon successful, and the tow then proceeded to destination. On reaching Newellton, it was found that the water at the point of delivery was very shallow, but the Walker No. 9 and those in charge of her instructed by representatives of T. L. James & Company, which company had arranged for the towage of the barge, to work the barge into the unloading dock over the bottom. This operation took approximately three hours and thereafter the barge was delivered into the sole care and custody of the said T. L. James & Company."

spondent and Claimant", but denied that in engaging claimant for the *tow*, it had acted as agent of anyone. Thereafter on September 8, 1955 James & Company filed its exception to the interpleader admitting claimant had, on June 1, 1953 written a letter [4] to the exceptor attempting to relieve itself from liability for its own negligence, to which exceptor acceded, but that the Supreme Court in its decisions handed down on May 16, 1955 in the cases of Bisso v. Inland Waterways Corporation, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911, 1955 A.M.C. 899; Boston Metals Co. v. The Winding Gulf, 349 U.S. 122, 75 S.Ct. 649, 99 L.Ed. 933, 1955 A.M.C. 927; and United States v. The S. S. Christopher Gale v. Nielson, 349 U.S. 129, 75 S.Ct. 654, 99 L.Ed. 939, 1955 A.M.C. 935, had held similar stipulations in towage contracts invalid and contrary to public policy. (Emphasis added.)

After these decisions claimant on March 29, 1956 filed its "supplemental and amended answer" alleging that the barge in question had been "consigned by libelant to the Louisiana Department of Highways c/o James & Company" under a straight bill of lading prepared and presented by libelant, signed by the Master of the Tug Walker No. 9 under which the barge and its cargo moved as freight, subject to Section 3 of The Harter Act, 46 U.S.C.A. § 192 and to all the terms and conditions of said bill of lading,[5] which also relieved it from liability or negligence of its agents and employees. Further that claimant had used due diligence to make the tug seaworthy, it was properly manned, equipped and supplied, and if there was any negligence, which it denied, the same was due to negligent navigation of the tug by her master.

Pursuant to this change of position and on motion of the claimant on April 16, 1956 Judge Christenberry signed a decree prepared and presented by claim-

4. " * * * All towing is done at owners' risk, we assuming no liability as to the craft towed and/or the cargo. We carry P & I insurance for the Tug Walker No. 9 and the Tug Tickfaw, for the value of the vessels, which protects against damage done to third party for which the boat might be responsible. The limit on the P & I insurance for the Walker No. 9 is $125,000, and for the Tickfaw, $90,000. This insurance is carried through the local agents, Hearin, Collens & McInnis, Baton Rouge, La. * * *."

5. "Sec. 9(a) If all or any part of said property is carried by water over any part of said route, and loss, damage or injury to said property occurs while the same is in the custody of a carrier by water the liability of such carrier shall be determined by the bill of lading of the carrier by water (this bill of lading being such bill of lading if the property is transported by such water carrier thereunder) and by and under the laws and regulations applicable to transportation by water. Such water carriage shall be performed subject to all the terms and provisions of, and all the exemptions from liability contained in the Act of the Congress of the United States, approved on February 13, 1893, and entitled 'An act relating to the navigation of vessels, etc.' and of other statutes of the United States according carriers by water the protection of limited liability, as well as the following subdivisions of this section; and to the conditions contained in this bill of lading not inconsistent with this section, when this bill of lading becomes the bill of lading of the carrier by water.

"(c) If the owner shall have exercised due diligence in making the vessel in all respects seaworthy and properly manned, equipped, and supplied, no such carrier shall be liable for any loss or damage resulting from the perils of the lakes, seas, or other waters, or from latent defects in hull, machinery, or appurtenances whether existing prior to, at the time of, or after sailing, or from collision, stranding, or other accidents of navigation, or from prolongation of the voyage. And, when for any reason it is necessary, any vessel carrying any or all of the property herein described shall be at liberty to call at any port or ports, in or out of the customary route, to tow and be towed, to transfer, trans-ship or lighter, to load and discharge goods at any time, to assist vessels in distress, to deviate for the purpose of saving life or property, and for docking and repairs. Except in case of negligence such carrier shall not be responsible for any loss or damage to property if it be necessary or is usual to carry the same upon deck."

ant's attorneys dismissing James & Company from the case.[6]

March 27, 1956 the parties stipulated certain facts including amount of damage if recovery was had and agreed that the court might render a final decree without further hearing.

It is conceded that the Tug Tickfaw was not involved.

■ The first question is, of course, was the arrangement between James & Company and the claimant by which the former's cement was to reach Newellton, one of towage or of carriage? There is apparently no doubt but that at the inception the parties in their pleadings treated the arrangement as towage.

James & Company chartered the barge Ideal Cement #7 in which to transport the cement it had bought from the libelant, to the point where it was to be used in performing a construction contract with the State Highway Department, as it had been doing with other barges for some time, under the same contract, and the claimant's sole obligation was to tow the barges thus furnished with their cargo to the landing near the work being done. In fact the latter's name and the business in which it was engaged, its manner of operations etc. point rather clearly to the fact that the arrangement was primarily one of towing the barges, either empty or with cargo, and not one for transporting or carrying freight as ordinarily understood. And it can hardly be denied that libelant, under the charter, warranted the seaworthiness

of its said barge, and had the cargo been lost due to defects in the barge alone, Ideal Cement Company or its barge would have been sued by James & Company, not the claimant, for the simple reason that the latter had nothing to do with furnishing the barge and had no information as to its condition of repair. Plainly all the documents and testimony of the witnesses show that the agreement of James & Company with claimant was to pick up the barges already loaded and to tow them to Burn Landing. Until this last shipment, it is conceded there was no privity of contract between it and libelant, and any change in that condition must depend upon this purported bill of lading, which the Captain of the tug signed. The original contract between James & Company and the claimant could not be changed from one of towage so as to bind the former without its consent. All Claimant's tugs used were employed in the same manner by James & Company, who paid the towage presumably, as well as the fee for the charter and the price of the cement to the libelant. The two contracts of charter and towage were entirely separate both in their nature and as to parties, although James & Company was a party to both. Its rights against libelant, in case of loss, rested .upon an entirely different basis i. e. the condition of the barge and its seaworthiness while as to claimant they would depend on the degree of care used.

Ordinarily, if the undertaking is one of carriage, the carrier furnishes the vehicle of carriage, its own bill of lading

**6.** "On motion of Baton Rouge Coal & Towing Company, through its undersigned proctors and on suggesting to the Court that mover has impleaded T. L. James & Company by petition filed under the 56th Admiralty Rule, and said T. L. James & Company is now before the Court in this proceeding; and

"On further suggesting that it now appears that mover cannot maintain its position originally taken in its 56th Rule petition by virtue of the decision of the Supreme Court of the United States in so-called "Bisso" Case; and

"On further suggesting that mover accordingly desires to dismiss its 56th Rule

petition against T. L. James & Company with prejudice, without costs; and

"On further suggesting that as will appear by reference to the consents of counsel appended hereto, there is no objection to such dismissal;

"It Is Ordered that mover Baton Rouge Coal & Towing Company be and it hereby is permitted to dismiss its 56th Rule petition against T. L. James & Company with prejudice but without costs, and accordingly T. L. James & Company be and it hereby is dismissed as a party from these proceedings.

"Baton Rouge, Louisiana, April 17, 1956."

with such terms as it provides, within the range of limitations imposed, either by law or the governing State of Federal Commission. Its customers may, for convenience, have in their possession blank forms of bills of lading, but they are usually supplied by the carrier. For some reason, not entirely clear, libelant had this document prepared with its own name printed therein, which the Captain of the tug signed, as he would have, according to the president of his company, any other form which would serve as a receipt for the tow. In the light of what took place, I am impressed that this alleged bill of lading was to serve the purpose of showing that the barge and its contents therein described had been received by claimant who, in its original answer, admitted it had been "picked up" as a tow.

For these reasons my conclusion is that the contract was one of towage, and not affreightment. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699.

### Negligence

■ Of course the burden was upon libelant to prove by a fair preponderance of the evidence that the damage was caused by the negligence of those operating the tow. Stall & McDermott v. The Southern Cross, 5 Cir., 196 F.2d 309.

■ The Tug Walker No. 9, towing the barge Ideal Cement No. 7, loaded with the last cargo to fill its contract with James & Company, left libelant's plant at Baton Rouge about 5:30 P. M. September 17, 1953 and was the lightest load of the entire lot. It was manned by a single crew of four, Captain Herren serving both as Master and Pilot, and did not move at night. The distance via the Mississippi River to Newellton was less than 175 miles (R. 7 et seq.). The stranding occurred about 12:45 P. M. the next day while the flotilla was proceeding along the right ascending bank, according to Captain Herren, 75 to 100 feet from shore. The current was between one and two miles per hour; weather and visibility "were good * * *", with little or no wind, and the speed 9 to 9½ miles per hour. The bow of tug was attached to the barge at the approximate center of its stern and was being pushed up stream. (R. 8). Having been called as the first witness on cross-examination, Herren gave further testimony as to what happened.[7]

For some three pages he persisted in saying and repeating that he would cross over to the point side of a bend in the river only when meeting another vessel to give the latter the benefit of the swifter water nearer the bend on the east side of the river, but continued to say he did not understand the questions as to the custom of practice at bends. Finally he was forced to admit that generally, there was more slack water on the point side which was usually followed by vessels traveling up stream, but insisted he followed the east or bend side on the occasion in question to avoid the current. It seems reasonable, therefore, in such a pushing operation, unless he was close enough to the east shore to avoid the swift current it would have a tendency to cause the front end of the barge to verge toward the bank. To meet this, he needed a solid connection of the two vessels and a firm holding of the wheel to keep that end away from the shore. The Tug Walker No. 9 was 87 feet long, 24 feet wide and 10 feet in depth. (R.

---

7. "Q. It is the custom in navigating the Mississippi River for the up-bound vessel to make the point and the down-bound vessel to make the bend, Isn't that so? A. That is customary.

'Q. Point Breeze was on the opposite side of the river from where you stranded 'Barge #7,' was it not? A. That is correct.

"Q. What, then, were you doing on the bend side of the river if you were an up-bound tug? A. Because in that vicinity the river has a sandbar just below the point. It extends from the point for five miles down the river, and the channel side of the river is on the right bank—over on the right bank, and I wasn't meeting any tow or anything, so I was just running it after my own judgment where I wanted to run in the river."

105). The Barge was approximately the same length and width, carried a load of 359 tons, and the overall flotilla was some 160 feet in length. Captain Herren had no pilot's license, paid no attention to current bulletins of the U. S. Engineers, but relied solely on his own judgment as to how close to the bank he should go. It was known to those familiar with the area that "fingers" of hard soapstone extended into the river from the east bank as much as 30 feet, over a distance of several hundred feet along the stretch between Wilkinson and Fort Adams lights, including the stranding point. Reluctantly he admitted he had seen this in extremely low stages of the river.

Captain Herren made no report of the stranding to either the U. S. District Engineers, or the Coast Guard as was required. 33 C.F.R. 207–180(h). One cannot read his testimony without being impressed that little effort was made to inform himself of conditions where he was traveling, but admitted under pressure he took some "chance" with the then low stage of the river in going closer to the bank than he had ever done before.

Admittedly some four days later he blotted out, so it could not be read, his entry on the log at the time of stranding, his conclusions as to cause. This, in itself, raises a suspicion as to his motive. The Chicago, 9 Cir., 94 F.2d 754; The Eureka, 9 Cir., 84 F.2d 496; The Glasgow Maru, 2 Cir., 102 F.2d 450. Whether he had knowledge of his employer's attempt to absolve itself from liability for negligence does not appear, but, the latter must have been influenced by that fact because it failed to require him to use information as to the stage, location of the navigation channel etc. readily accessible. Had he done so the

stranding most probably would not have happened.

Then, too, in spite of the damage already done, Herren dragged and forced the barge over the bed of Palmyra Lake to the landing which required some three hours, when normally it would have taken only a few minutes. To this time, no one knows how much additional damage was done there. It was claimant's duty, under the circumstances to differentiate the damages there, if any, from those caused by the stranding. When brought to task about this, his response was typical of his attitude.[8] No effort was made to determine depth of the water at the point of stranding by the use of sounding lines, although he stated that when the barge was pulled off the submerged object, it slid into deep water between the object and the shore; that he moved the tug up beside barge and anchored to the river bank with the tug's front end abreast of the stern of the barge. It took only ten or fifteen minutes to free the barge off whatever it had struck, but quite a while to get Captain Werner on the telephone, how much Herren did not say. After that, being "tired" he decided to rest, and did not resume the voyage until next morning about 7:00 o'clock. At that time the barge appeared to be in condition to continue. As stated, with the better part of a half day in which to do so, he made no attempt to determine the nature of the object, its size or the depth of the water to enable him to make reports to the Engineers or Coast Guard, or to enlighten his employer, notwithstanding he had anchored in close proximity.

The Court finds that the evidence, as a whole, supports by a fair preponderance, the conclusion that the barge was

---

8. 'Q. Tell me this—When you were up at Palmyra Lake, did anybody order you to drag this 'Barge No. 7' over the bottom? A. No, sir.

"Q. Nobody told you that. A. *Nobody told me that, but I had orders to take it up there and I was going to get it there.*

"Q. But nobody that worked for T. L.

James had anything to say about that? A. I don't know. They was standing up there on the bank looking at us when we were dragging it in there, and nobody never said nothing. We couldn't very well go off and leave it right out there in the middle of the lake anyhow." (Emphasis supplied.)

stranded on one or more of the soapstone "fingers" or ridges not more than 30 feet from the east shore and outside the navigable channel; and was due to the actionable negligence of the Master Pilot. The Nathan Hale, D.C., 91 F. 682; C.J. Vol. 63, P. 26, Verbo Towage § 62; 86 C.J.S., Towage, § 41; The George Hughes, 2 Cir., 183 F. 211; The Florence, D.C., 88 F. 302.

The libelant should, therefore, have judgment for the stipulated amount of damages with interest. Proper decree should be presented.